STATE *ex rel.* DAVIS TRUST CO., *Admr., etc.*

*v.*

EDGAR B. SIMS, *Auditor of The State of West Virginia*

(No. 9977)

Submitted September 3, 1947.   Decided November 4, 1947.

*Brown & Higginbotham,* for relator.

*Ira J. Partlow,* Attorney General, *W. Bryan Spillers* and *Eston B. Stephenson,* Assistant Attorneys General, for respondent.

HAYMOND, JUDGE:

In this original proceeding the petitioner, Davis Trust Company, Administrator of the personal estate of Lucy Ward, deceased, seeks a peremptory writ of mandamus in this Court to compel the defendant, the Auditor of West Virginia, to issue a warrant upon the State Treasurer for the payment of an appropriation of $5,000.00 made by the Legislature of this State to satisfy the claim of the petitioner for damages resulting from the death of its intestate, an elderly lady, who was raped and murdered on January 20, 1945, by a felon under sentence of life imprisonment while he was absent from the state prison at Huttonsville in Randolph County, West Virginia, to which he had been previously assigned by prison officials acting in behalf of the State of West Virginia as its authorized representatives.

The State Court of Claims, by a two to one decision, allowed the claim which the petitioner prosecuted before that tribunal, awarded $2,500.00 as compensation for the death of the decedent, and recommended to the Legislature that it authorize the payment of that amount. By a special act passed by both houses on March 8, 1947, effective from its passage, without the approval of the Governor, and which contained recitals that an escaped convict from the state prison farm at Huttonsville, West Virginia, on January 20, 1945, raped and murdered Lucy Ward, that his escape was due to the gross and inexcusable negligence of a prison labor guard then in the employ of the State of West Virginia, and that her heirs at law have suffered mental anguish and the loss of her services, the Legislature authorized and directed the Auditor to issue his warrant upon the Treasurer, payable

from the state general revenue fund, in favor of the petitioner as administrator of the estate of the decedent for $5,000.00, as compensation to her heirs for her wrongful death, and declared the appropriation of that amount necessary to discharge a moral obligation of the State. Chapter 30, Acts of the Legislature of West Virginia, 1947, Regular Session. The Legislature also incorporated in Title II of the general appropriation act of 1947, Chapter 27 of the Acts of the Legislature of West Virginia, 1947, Regular Session, two appropriation items of $2,500.00 each for a claim against the State Board of Control, Huttonsville Medium Security Prison, to which the convict had been assigned at the time of the murder, to be paid from the general revenue fund, in favor of the petitioner.

Following this action of the Legislature, the West Virginia Board of Control issued its requisition on the Auditor in favor of the petitioner for the payment of the sum of $5,000.00. On May 2, 1947, the Auditor refused to honor the requisition for the stated reasons that the requested payment would constitute an unauthorized gift of public funds and that there was no liability of the State for the civil wrongs of its employees. The petitioner then instituted this proceeding in this Court.

The defendant filed his written demurrer to the petition by which he challenged its legal sufficiency upon numerous assigned grounds. The case was submitted to this Court for decision upon the petition and the demurrer and the briefs and the oral argument of the attorneys for the respective parties.

The allegations of the petition, which on demurrer must be regarded as true, and the opinions of the State Court of Claims to which the petition makes reference, disclose an unusual factual condition. Lucy Ward, the decedent, past seventy-three years of age at the time of her death and a respected citizen of Randolph County, had resided for many years with her sister and her brother on a farm near the Town of Huttonsville in that county. James Chambers, colored, an inmate of a state prison known as

the West Virginia Medium Security Prison, located in the neighborhood of the Ward farm, was serving a sentence of life imprisonment for murder and had previously been transferred from the State Penitentiary at Moundsville to the prison at Huttonsville. The murder for which the sentence of life imprisonment had been imposed upon him had been committed by Chambers in Wyoming County on April 1, 1935, at which time he killed a colored woman by cutting her throat with a razor. In 1941, during his confinement in the penitentiary at Moundsville, Chambers attacked another female inmate of that institution and stabbed her in the hip with a knife because she refused to have sexual relations with him. On another occasion he accosted her in a bathroom of the prison. For his misconduct he was punished by being confined to his cell and restricted to two meals a day for a period of sixty days. Sometime later, while working as a member of a prison road crew, he attacked a fellow prisoner with a knife. He was afterwards transferred by proper authority to the prison at Huttonsville.

On the morning of January 20, 1945, Chambers unaccompanied and unobserved, left the prison, went to the Ward farm, entered the barn where his victim was engaged in milking a cow, and there, after raping her, murdered her with a knife. He then returned to the prison. His absence from the prison was not known to the authorities there until after the commission of the crime. After the murder was discovered, Chambers was tried, sentenced to death, and hanged in the penitentiary at Moundsville.

Shortly after the murder of Miss Ward a committee of the Legislature made an investigation and a report of the conditions which existed at the prison at Huttonsville. The report disclosed that the absence of Chambers from the prison when he committed the murder was not known to anyone in authority at the institution. It also revealed that prisoners were allowed to leave the prison at will unaccompanied by any guard; that they had attempted to rape women in that neighborhood, for which they had

not been punished; that they had been arrested for other offenses while absent from the prison late at night; that they possessed keys to gasoline tanks and outside buildings of the prison; and that the knife with which Chambers killed his victim was obtained by him from articles of prison equipment. There was neither proper discipline nor adequate supervision of the prisoners. Under these conditions Chambers spent approximately six months of his term of life imprisonment, from July 27, 1944, when he was transferred to the Huttonsville prison, to January 20, 1945, when he murdered Miss Ward during his absence from that institution and while he was temporarily actually free from confinement.

The recital of the foregoing undisputed facts indicates beyond question that the authorities in charge of the Huttonsville prison and their agents completely disregarded the duty imposed upon them to keep Chambers securely confined to the prison at all times. Instead they afforded him the opportunity to leave the institution at will, without their knowledge of his absence, and without any surveillance whatsoever of his whereabouts or his behavior. Those responsible for his confinement were fully aware of his vicious character and his dangerous propensity to engage in voilent and murderous conduct. He was prone to commit revolting sexual offenses. His criminal record, from April 1, 1935, when he murdered his first victim, and while he was serving his sentence of life imprisonment as punishment for that crime, gave warning of his dangerous and vicious disposition and marked him as a killer and a sexual degenerate of a violent type. Those whose duty it was to guard him and who, disregarding that duty, failed to watch and confine him, should have known and indeed expected that he would commit rape or murder, or both, whenever the opportunity occurred for him to perpetrate either of those crimes. Instead of being kept in close confinement in the penitentiary at Moundsville during the full term of his imprisonment he was, without any excuse or any discernible justification, transferred to the West Virginia Medium Security Prison, which by

statute was then deemed to be a part of the penitentiary, Section 1, Chapter 103, Acts of the Legislature of West Virginia, 1939, Regular Session, where he remained under relaxed and indifferent supervision and where he was free from any effective surveillance. In these wholly unwarranted circumstances that which should reasonably be expected to happen actually did occur. In reality a man known to be a killer was allowed to roam at will, unguarded and unobserved. It would have been surprising if, under those conditions, an event of that nature had not come to pass.

In support of his demurrer the defendant advances several grounds which are embodied in these summarized assignments: (1) The allegations of the petition do not establish a moral obligation against the State for which a valid appropriation may be made by the Legislature; (2) the appropriation is for a purely private purpose and is null and void as a gift and as a grant of the credit of the State in violation of Article X, Section 6, of the Constitution of West Virginia; (3) the appropriation of moneys for the payment of the claim of the petitioner is not authorized by the provisions of Article VI, Section 51 of the Constitution of this State or by Section 1, Article 3, Chapter 12 of the Code of West Virginia, 1931; (4) the operation and the maintenance of a state prison are a governmental function as to which, in the absence of the imposition or the voluntary assumption of liability by a valid statute, the State is not liable for the acts or the omissions of its officers, agents or employees; and (5) the State is under no moral obligation to pay the appropriation of the Legislature in satisfaction of the claim of the petitioner because of its immunity from liability and because it has received no benefit or value as a consideration from such claim or for the payment of the appropriation.

These contentions present the controlling question in this proceeding. That question is whether the facts alleged in the petition describe a condition upon which the Legislature may base a declaration of the existence of a. moral obligation of the State for the discharge of which

it may make a valid appropriation of public funds. If the condition disclosed by the facts in this case justifies the declaration of the existence of a moral obligation of the State and the appropriation of public funds for its payment by the Legislature, its action in that respect is valid; if not, the declaration and the appropriation are beyond the scope of its legislative power and they are, for that reason, null and void.

This Court has considered the question of the existence of a moral obligation of the State, based upon particular factual situations, in several cases. In some of these cases, the existence of an obligation of that character has been recognized. *Woodall v. Darst,* 71 W. Va. 350, 77 S. E. 264, 44 L. R. A., (N. S.), 83, Ann. Cases 1914B, 1278; *Glover v. Sims,* 121 W. Va. 407, 3 S. E. 2d 612. Upon the facts in other cases, this Court has held, notwithstanding the declaration of the Legislature, that a moral obligation of the State did not exist. *State ex rel. Cashman v. Sims,* 130 W. Va. 430, 43 S. E. 2d 805; *State ex rel. Adkins v. Sims,* 130 W. Va. 645, 46 S. E. 2d 81, this day decided.

The declaration by the Legislature of the existence of a moral obligation of the State, based upon facts which give rise to a judicial question, will be investigated and considered by the courts; and the determination of the existence of an obligation of that character is a judicial function. Though entitled to serious consideration, the legislative declaration of the existence of a moral obligation of the State is not conclusive or binding upon this Court. *State ex rel. Adkins v. Sims,* 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Cashman v. Sims,* 130 W. Va. 430, 43 S. E. 2d 805. When, however, a doubt exists whether the purpose of an appropriation is public or private it will be resolved in favor of the appropriation. *Woodall v. Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A., (N. S.), 83 Ann. Cas. 1914B, 1278; *State ex rel. Cashman v. Sims,* 130 V. Va. 430, 43 S. E. 2d 805.

In the *Cashman* case, this Court stated a general rule by which, subject to certain exceptions, the existence of a

moral obligation of the State in favor of a private person may be recognized and for the payment of which a valid appropriation of public funds in the public interest may be made by the Legislature in any particular instance. An obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons, is within the scope and the application of the rule.

It is clear that the facts of this case gave rise to a duty upon the part of the prison authorities, as the agents and the employees of the warden of the penitentiary and who were subject to the orders of the West Virginia Board of Control which, by statute, Section 3, Article 1, Chapter 25, Code, 1931, is charged with the management and the control of the prisons of this State, and upon its members, as the representatives of the State, to exercise due care to keep the convict Chambers in continuous and secure confinement and to prevent his escape while his sentence of life imprisonment remained in force and effect. In fact the duty to keep Chambers securely confined, to enforce strict discipline, and to prevent his escape, was imposed upon the members of the board, the warden of the penitentiary, the deputy warden at the medium security prison who was answerable to the warden, and the assistants and the employees acting as guards at that institution, by statutes of this State in force and effect when Chambers raped and murdered Miss Ward. This duty could not be ignored or delegated by those upon whom it rested and by whom it should have been performed.

The warden is the chief executive officer of the State Penitentiary. He has charge of its internal police and management. He is required to provide "for feeding, clothing, working and taking care" of the convicts subject to the control of the Board of Control, and to enforce promptly all orders, rules and regulations of the board and strict discipline among the convicts. He may also punish the convicts, or cause them to be punished, in the manner authorized by the board. Section 3, Article 5,

Chapter 28, Code, 1931. The warden, by statute in force at the time of the murder of Miss Ward, was also directed to appoint a deputy warden to be in charge of the West Virginia Medium Security Prison, at Huttonsville, which was then deemed to be a part of the penitentiary, and to fix the duties of the deputy warden who was answerable to the warden. Sections 2 and 3, Chapter 103, Acts of the Legislature of West Virginia, 1939, Regular Session. The warden was authorized to appoint all assistants and employees necessary for the management of the penitentiary including a sufficient number of guards to preserve order and to enforce discipline among the convicts, to prevent escapes, and to remove all persons convicted and sentenced to the penitentiary from the place of their confinement to the penitentiary; and he had control of all such personnel. Section 11, Article 1, Chapter 25, and Section 5, Article 5, Chapter 28, Code, 1931. The Board of Control had the authority to cause the transfer of any inmate from any state institution, except the penitentiary, to any other state institution better fitted to care for such inmate or for other good cause or reason. Section 16, Article 1, Chapter 25, Code, 1931. Section 2 and 3, Chapter 103, Acts of the Legislature of West Virginia, 1939, Regular Session, were amended by Chapter 148, Acts of the Legislature of West Virginia, 1947, Regular Session, and two new sections were added to the statute. The effect of this subsequent legislation was to designate the West Virginia Medium Security Prison a separate penitentiary; to provide a warden for it as its chief executive officer, to be appointed by the Governor, to perform such duties as may be fixed by the Board of Control; to make the laws governing the penitentiary at Moundsville applicable except as to criminal proceedings against its inmates; and to make provision for the transfer, upon request of the warden of either prison, of prisoners from one institution to the other, by order of the board. These amendments, however, have no application to the situation which existed on January 20, 1945, the date of the murder of Miss Ward, and the earlier statutes already referred to were effective at that time.

Obviously the members of the Board of Control and the warden, in the actual operation of the prison by law placed under their management and control, must rely upon their subordinates in matters of detail and routine and no personal criticism is directed to them by any statements in this opinion. This absence of criticism, however, does not relieve them of their official responsibility for the misconduct of their subordinates or the conditions which they permitted to exist at the medium security prison while Chambers was serving his sentence there.

Undoubtedly, if the breach of the foregoing duty by these officers and their employees which the undisputed facts establish, had been committed by a private person, having the lawful control and custody, and charged with the safekeeping, of another person of the known vicious character and the dangerous disposition and the violent propensities of the convict Chambers, such breach would have rendered his keeper liable to an injured person for injury and damage inflicted upon him and which resulted from the reasonably expected or anticipated acts and conduct of the wrongdoer whom the keeper had negligently failed to restrain or to confine. Or if Chambers had been a patient in a privately operated hospital or like institution and its operator or his agents, with knowledge of his vicious character and dangerous propensities as a killer, permitted him to roam at will, unguarded or without effective surveillance, and by such acts or omissions afforded him the opportunity to kill, and he did kill, one of its patients, employees or visitors, it is manifest that those responsible for his wrongful act would be liable in damages for the consequences which they should have reasonably foreseen or anticipated.

Though this Court recognizes the fundamental natural differences between the reasonably anticipated acts of a human being and those of a domestic animal, the undisputed facts of this case suggest a close analogy to cases in which the owner or the keeper of a dog or a horse, known to be of a vicious nature or to possess a particular propensity to cause injury, has been held liable for failure

to anticipate and to guard against the conduct of such animal which causes injury or damage to another person. 3 C. J. S., Animals, Paragraph 145. In *Butts* v. *Houston,* 76 W. Va. 604, 86 S. E. 473, an action to recover damages for the death of an infant son of the plaintiff which resulted from a vicious attack by a horse of the defendant, the rule is stated to be that wherever it clearly appears that, although an animal is domesticated, it has a tendency or is disposed to attack persons or property and inflict injury, of which the owner has notice, the duty is imposed upon him by law to keep it securely restrained and he will be liable to one who without fault is injured as a result of its harmful act. Other situations, analogous in principle, could be mentioned, but reference to them is not considered necessary. Chambers was a recognized killer. With a knife he had killed one woman and on separate occasions he had attempted to kill another woman and another man. The duty resting upon the prison officials, as representatives of the State, was a duty which would be judicially recognized as legal in cases between private persons within the rule of the *Cashman* case, and their acts and their omissions, established by the particular facts which appear in this proceeding, gave rise to a moral obligation of the State in favor of the petitioner. The declaration by the Legislature of the existence of that obligation and its action in appropriating money to discharge it are within the legitimate scope of its legislative power and are valid.

In support of his demurrer the defendant invokes and relies upon the general principle that persons in charge of a state convict are not liable in damages for a tort committed by him, while at large by their negligent permission or because of their negligence in failing to keep him securely confined, for the reason that ordinarily their misconduct is a remote and not the proximate cause of the wrongful act of the convict which is essential to render them liable to the person injured. This doctrine is generally recognized and is supported by reason and authority. 38 Am. Jur., Negligence, Section 71. *Henderson*

v. *Dade Coal Co.*, 100 Ga. 568, 28 S. E. 251, 40 L. R. A. 95; *Hullinger* v. *Worrell*, 83 Ill. 220; *Thomas* v. *Sloss-Sheffield Steel and Iron Co.*, 144 Ala. 188, 39 S. 715. It does not, however, operate to relieve the State of its moral obligation to the petitioner, for the reason that it is not applicable to the present peculiar factual situation upon which that obligation is predicated. This is not the case of a convict who has escaped or been allowed to go at large by the negligence of his keepers who were unaware of his vicious disposition or dangerous propensity to kill or injure another person and who could not reasonably anticipate or foresee that an act of that nature would be the natural or probable consequence of his freedom from restraint. In such instances it is generally held, and rightly so, that those in charge of the convict are not liable for the reason that the causal connection between their negligence and the injury caused by his wrongful act is broken by the interposition of an independent responsible human force or agency which, rather than their negligent conduct, is the proximate cause of the injury. The facts of the present case distinguish it from the cases which fall within the foregoing general rule. This decision is not at variance with that rule and does not question its soundness.

The defendant calls attention to the requirement that negligence to be actionable must be the proximate cause of the injury. *Donald* v. *Long Branch Coal Co.*, 86 W. Va. 249, 103 S. E. 55. The essential of proximate cause, however, is established by the facts relating to the death of the decedent for which the petitioner seeks compensation from the State. Before Chambers killed Miss Ward his vicious disposition and his propensity to attack and injure persons when in possession of a knife had been demonstrated upon at least two occasions while he was serving his sentence for the murder of his first victim, whom he destroyed by cutting her throat with a razor in 1935. His previous criminal record and his dangerous character were known to the prison authorities to whose custody and control he had been committed by the sentence of

life imprisonment in the penitentiary. The natural and probable consequence of his freedom from secure and continuous confinement or restraint, which should have been anticipated and foreseen by his keepers, was that he would injure or kill any person, especially a female, whom he might encounter in circumstances which would afford him an opportunity for an attack of that nature. Yet, with this knowledge, and by it warned that, if permitted to be at large, unwatched and unguarded, he would likely injure or kill a human being, they afforded him the opportunity to leave the prison alone while unaware of his absence and of his possession of a knife which he had obtained at the very institution in which he should have been kept in strict confinement and denied access to any weapon at any time. That which, in the circumstances, could reasonably be foreseen or anticipated by an ordinarily prudent person actually did occur. It should have been expected. The negligence of the officers and the agents of the State responsible for his secure confinement, arising from these acts and omissions, was the proximate cause of the death of Miss Ward. Otherwise stated, her death was the natural and probable consequence of their negligent acts and omissions. "If an injury is the natural and probable consequence of an act done under such cirsumstances and with such knowledge, as ought to have disclosed the danger to an ordinarily prudent person exercising reasonable foresight, the actor is guilty of negligence in the premises and legally liable in damages for the injury." *Fields* v. *Director General of Railroads*, 86 W. Va. 707, 104 S. E. 767. "Party committing breach of duty is liable for its natural and proximate effects, which may be immediate or through subsequent media of natural forces or other innocent causes." *Mills* v. *Indemnity Ins. Co. of North America*, 114 W. Va. 263, 171 S. E. 532. A person is liable for damages occasioned by his negligence where they could reasonably have been anticipated by an ordinarily prudent person. *Colonna* v. *Rosedale Dairy Co.*, 166 Va. 314, 186 S. E. 94.

The defendant vigorously asserts that as the State is

not liable for the tortious acts of its officers, agents and employees unless such liability is assumed by or imposed upon it by valid statute, no moral obligation of the State arising from such acts is shown to exist in favor of the petitioner. *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805; *Hayes* v. *The Town of Cedar Grove,* 126 W. Va. 828, 30 S. E. 2d 726, 156 A. L. R. 702. That contention is without merit. The general principle, recognized by this Court, that in the absence of a valid statute or a constitutional provision assuming or imposing liability upon it, a State is not liable for the tortious acts of its officers, agents and employees, relates to legal liability, and denies the existence of any such liability as a result of the wrongful acts of its representatives. It does not operate to prevent the recognition of a moral obligation of the State arising from or predicated upon the misconduct of its officers, agents and employees, such as would be judicially held to constitute a breach of a legal duty in cases between private persons. In the *Cashman* case there was no showing of misconduct by the representatives of the State, and the denial of the existence of a moral obligation in that case is clearly distinguishable from the holding in this proceeding that an obligation of that nature arises from the uncontroverted facts. As stated in the opinion in the *Cashman* case, no conduct by the State was established which if engaged in by a private person would amount to negligence. The absence of negligence upon the part of the representatives of the State is also recognized in the case of *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81. In the opinion in that case this Court said: "We do not think the failure of the state road commissioner to provide guard rails and road markers, and to paint a center line on the highway, constitutes negligence of any character, and particularly no such negligence as would create a moral obligation on the part of the State to pay damages for injury or death, assumed to have occurred through such failure, and as the proximate cause thereof." In the present proceeding it is clearly established that the conduct of the represent-

atives of the State is such that if it had been effected by a private person it would have constituted negligence. Within the above stated principle of exemption from legal liability of the State for the wrongful acts of its officers and agents, any liability whatsoever upon its part must be voluntarily assumed or imposed by constitutional legislative enactment. *Hayes* v. *The Town of Cedar Grove,* 126 W. Va. 828, 30 S. E. 2d 726, 156 A. L. R. 702.

Any moral obligation of the State which may be judicially recognized, and satisfied by the payment of public funds, must be imposed or voluntarily assumed by a valid act of the Legislature which finds and declares the existence of such an obligation. In the exercise of its judicial function, this Court decided, in the *Cashman* case, that a moral obligation of the State did not exist, notwithstanding the declaration by the Legislature of its existence, because the facts upon which the declaration was predicated did not give rise to an obligation of that character and held that such legislation as declared its existence and appropriated money for its payment was unconstitutional. Upon the peculiar facts of this case, the statute by which liability upon the part of the State for the claim of the petitioner is voluntarily assumed and the existence of a moral obligation is declared, is upheld as valid and constitutional.

The contention of the defendant that the State and its political subdivisions are not liable in the maintenance and the operation of prisons for the negligent acts of its officers and agents because they are engaged in the performance of a governmental function, is answered and disposed of by the statements contained in the preceding paragraph of this opinion. The absence of legal liability of the State and its subdivisions for the negligent acts of its officers and agents in the exercise of a governmental function is necessarily included in and governed by the general principle of the exemption of the State from legal liability for the tortious acts of its officers and agents whether they are at the time engaged in the exercise of a governmental function or in any other type.

of official activity or conduct. Though there can be no recovery against the State on any cause of action whatsoever, other than as garnishee or suggestee, because of the constitutional provision that it shall never be made a defendant in any court of law or equity except as a garnishee or a suggestee in a garnishment or an attachment proceeding, Constitution of West Virginia, Article VI, Section 35, and though there can be no cause of action against the State or any of its subdivisions for the negligent acts of its officers or its agents in the exercise of a governmental function, *Hayes* v. *The Town of Cedar Grove,* 126 W. Va. 828, 30 S. E. 2d 726, 156 A. L. R. 702, these fundamental and well established principles do not prevent the recognition of a moral obligation upon the part of the State in a situation in which an obligation of that character may, within the principles expressed in the decisions of this Court, be declared by the Legislature to exist and which, upon consideration by the courts, is such as calls for judicial sanction. A moral obligation of the State can occur only in instances in which no suit or action can be maintained against the State, though there may be a cause of action, as, for example, upon a valid contract, or in which no cause of action, legal or equitable, exists against it even if it did not enjoy constitutional immunity from suit. Whether such an obligation arises in those situations depends upon the particular facts involved and requires the voluntary action of the Legislature by valid statute in recognizing and declaring its existence.

The doctrine which gives rise to a moral obligation of the State, in any particular instance, is not rendered inoperative by, and it is not incompatible with, the principle which recognizes the immunity of the State from suit, or the principle which denies the existence of a cause of action against it for the negligence of its officers, agents, or employees. It rests upon considerations of an entirely different and independent character. If the State were subject to suit or action, or a cause of action existed against it for the negligence of its officers, agents or em-

ployees, while engaged in the discharge of a governmental function or in other activity or conduct; or if there were a legal liability upon the State, or any legally recognized remedy for such against it, there would be no occasion for one aggrieved or injured to seek from the State, upon the basis of a moral obligation, the relief which he is denied by positive law but to which he would be entitled if, in the identical situation, an obligation or a duty would be judicially recognized in cases between private persons. Only when the conduct of the officers or the agents of the State, for which it is not legally liable, is such that, if engaged in by private persons, it would constitute the breach of an obligation or a duty, legal or equitable, which would be judicially recognized in cases between private persons, does the nature or the effect of such conduct require consideration in determining whether a moral obligation of the State exists. And to give rise to an obligation of that character the factual situation must be such as to justify legislative action declaratory of its existence, and the obligation must be imposed upon or voluntarily assumed by the State by the enactment of constitutional legislation.

For the reasons stated a peremptory writ of mandamus is awarded to require the defendant to issue a proper warrant upon the State Treasurer for the payment of the money appropriated in the amount of $5,000.00 in satisfaction of the claim of the petitioner.

*Writ awarded.*

Lovins, Judge, dissenting:

It is with some reluctance that I dissent from the opinion of the Court in this proceeding. The facts of the case are appealing, involving as they do the torture and murder of an aged woman by a brutal convict. Nevertheless, such facts do not justify the award of a writ of *mandamus* against the respondent. This proceeding involves the power of the Legislature to tax and appropriate money, derived therefrom, for public purposes. Thus consideration should be given to the constitutional powers of that body.

Except as limited by the Constitution, the Legislature is vested with legislative powers which are almost plenary. *Road Commission* v. *County Court,* 112 W. Va. 98, 163 S. E. 815. Among such powers is the power to tax and appropriate the money so derived for public purposes. If the Legislature has no power to tax, it has no power to appropriate money. The powers of taxation and appropriation are coordinate. 1 Cooley, Taxation, 4th ed., Section 177. The Legislature of this State has no power to tax and appropriate money for private purposes. *Woodall* v. *Darst,* 71 W. Va. 350, 77 S. E. 264. Was the appropriation made by the Legislature in the instant case for a public or private purpose? If such appropriation was made to discharge a moral obligation, it was for a public purpose, notwithstanding that the money is to be paid to, and expended by a private person. *Woodall* v. *Darst, supra.*

I apprehend no material advantage will accrue to the public from the appropriation so made, as the money derived therefrom will be distributed to the persons entitled thereto under the will of Miss Ward, or distributed in accordance with the applicable statute. There is a line of authorities which clearly indicates that the moral obligation of a state must relate solely to a public matter. I have found few cases decided by this Court where a moral obligation was upheld, and in instances where it has been upheld, it would seem that a public benefit had accrued to the state, or the acts of the claimants were performed in furtherance of a public policy.

In *Woodall* v. *Darst, supra,* the principal question for decision was whether a member of the National Guard of this State should be compensated for the injury suffered by him in line of duty and without fault on his part. It is disclosed in the *Woodall* case that prior to the injury suffered by claimant, the Legislature had provided by statute that members of the National Guard injured without fault on their part should be provided for "in a monetary way." That statute, providing for compensation to a member of the National Guard, was in furtherance of the

well-established duty and public policy concerning a military establishment for this State. It is a matter of history that even before the Revolution, and particularly since the establishment of the United States of America, a militia was provided for the maintenance of order and protection of the citizens. Woodall was assisting in carrying out that public policy, in the course of which he suffered injury. The State, having promised by legislative enactment to compensate him, was under a moral obligation of the highest type to do so.

In the case of *Glover* v. *Sims*, 121 W. Va. 407, 3 S. E. 2d 612, this Court upheld a moral obligation providing for the payment of compensation for property from which the State or one of its agencies had derived benefit. A similar situation existed in the case of *Slack* v. *Jacobs*, 8 W. Va. 612.

In other jurisdictions the question of moral obligation frequently arose in connection with the payment of bounties to persons volunteering for service in the Army of the United States during the Civil War. In almost every instance where the public interest was so involved, the courts upheld the appropriations as valid and as resting on a moral obligation. See *Taylor* v. *Thompson, et al.*, 42 Ill. 1; *City of Lowell* v. *Oliver*, 90 Mass. 427. On the other hand there is a line of decisions which unerringly holds that the Legislature had no right to make provision for donations out of public funds, or to compensate people for purely private expenditures. *Freeling, et al.* v. *Hastings, et al.*, 10 Mass. 570; *Mead* v. *Inhabitants of Acton*, 139 Mass. 341, 1 N. E. 413.

Depending upon constitutional provisions, actions or suits are permitted against the sovereign in some jurisdictions. But in this State the Constitution forbids the State of West Virginia to be made a defendant in any court of law or equity. Constitution, West Virginia, Article VI, Section 35. Nor shall the credit of the State be granted "to, or in aid of * * * any * * * person." Constitution, West Virginia, Article X, Section 6.

I do not think that the facts in the instant case show that a moral obligation existed for which an appropriation of public funds could lawfully be made. Admittedly, the failure to confine and supervise the convict gave him an opportunity to commit the crime which gave rise to this litigation. But it cannot be controverted that the confinement and supervision of the convict was a governmental function of the highest character. To say that a moral obligation calling for the payment of money arises out of the failure of the sovereign, through its officers, agents, and employees, properly to exercise the powers of government is to create needless confusion. Such action gives rise to an intolerable state of affairs, and the government would be reduced to the extremity of defending in court every act, every policy and every course of conduct adopted by its constitutional officers and agencies.

In *Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, the rule for determining a moral obligation is stated in the following language:

> "The sound and just general rule by which a moral obligation of the State in favor of a private person may be recognized, and for the payment of which a valid appropriation of public funds in the interest of the public may be made by the Legislature, requires the existence of at least one of these components in any particular instance: (1) An obligation or a duty, by prior statute created or imposed upon the State, to compensate a person for injury or damage resulting to him from its violation by the State or any of its agencies, or to compensate him for injury, damage, or loss sustained by him in or by his performance of any act required or authorized by such statute; or (2) an obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons."

Although I assented to that rule, I think the second proposition stated in the above quoted rule is inaccurate where an obligation arises in the performance of a gov-

ernmental function, for the reason that there is no analogy between a private person and a sovereign state in relation to the exercise of such functions and powers. To that extent I am not in agreement with the rule stated in the *Cashman* case.

The gravamen of the majority opinion will be found in that part discussing scienter or knowledge of the officials and employees of the penitentiary and Huttonsville Medium Security prison relating to the criminal tendencies of the convict who killed Miss Ward, as evidenced by his prior criminal acts. I do not think that it necessarily follows that, because those officials and employees knew of such criminal tendencies, they are charged with responsibility for the acts of that person in committing a vicious crime.

Moreover, in every instance wherein a person is sentenced to a jail, penitentiary, or other penal institution in this State, the officials in charge of such jail, penitentiary or other penal institution, must, of necessity, know that the person has been convicted of a certain type of crime. Carrying the reasoning of the majority opinion to its logical and ultimate conclusion, such knowledge would import that if a person has been convicted of a crime of a certain character that he must be carefully supervised and controlled, even after his discharge from confinement, so that he cannot commit a similar crime. The vague nature of the duty imposed by the majority opinion would hint that the administrative and executive officers of the State, having such knowledge, should continue to supervise and control a discharged prisoner to prevent his committing a similar crime, and in the absence of such supervision and control the State would incur a moral obligation. Nor do I believe that the public should be required to pay for the acts of prisoners when confined, or of a prisoner who has been discharged. It will not do to say that supervision and surveillance should continue only so long as a prisoner is in custody, as such an entry into the realm of moral obligation of the State has few, if any limitations.

I think that even if we consider the failure of the officials and employees in charge of the convict in this case properly to confine him, to constitute negligence, such negligence is not the efficient and proximate cause of the death of Miss Ward. Although the majority opinion attempts to draw an analogy between the convict and a dangerous animal, that analogy is not well taken. An animal, so far as science has been able to ascertain, has little, if any, reasoning powers and is guided solely by instinct. The convict in this case was a human being, capable of thinking and reasoning, and when he was free from the custody of his lawful keepers, could voluntarily carry out any objectives which might occur to his mind. Of course, it may be said that the past conduct of a person is a fairly reliable guide for prediction of his future actions, but that is not necessarily so, since the future conduct of a human being cannot be gauged with accuracy. The mental processes of the convict and his acts in pursuance thereof were independent acts, not caused by the negligence of the officials of the State. The causal connection between the negligence of the officials and employees of Huttonsville Medium Security Prison having been broken, the proximate cause of the injury to Miss Ward was the act of the convict himself. The negligence of the officials and employees above mentioned afforded him an opportunity to perform the independent act done by him, but did not cause it. *Thomas* v. *Sloss-Sheffield Steel & Iron Co.* (Ala.), 39 S. 715; *Henderson* v. *Dade Coal Co.* (Ga.), 28 S. E. 251. See *Stuck* v. *Railway Company,* 76 W. Va. 453, 86 S. E. 13; *Anderson* v. *Railroad Co.,* 74 W. Va. 17, 81 S. E. 579; *Donald* v. *Coal Co.,* 86 W. Va. 249, 103 S. E. 55.

The result reached in this case will be a starting point for the assertion of a moral obligation against the State, incurred in performing governmental functions. I do not think that this State, even with the assent of, or in obedience to, the Legislature, should be required to pay for the acts of persons escaped from public penal institutions. If compensation be paid to persons for injury, inflicted by

a convict after he has been tried, why should not the State compensate the person injured by the original act constituting the crime? It would be almost as reasonable to say that a person injured by a second offender, after discharge of that offender from imprisonment, should be compensated.

I believe that public funds raised, as they are, by taxation which, in some instances, is burdensome, should not be dissipated by the assumption of a moral obligation when none exists.

Therefore I would deny the writ.