MARY ORESTA, *et al.*

*v.*

ROMANO BROTHERS, INC., *et al.*

(No. 10455)

Submitted September 16, 1952. Decided December 16, 1952.

634

*Roscoe H. Pendleton* and *Jess J. McCoy*, for plaintiffs in error.

*Richardson, Hudgins & Hancock*, for defendants in error.

HAYMOND, JUDGE:

The plaintiffs, Mary Oresta, Mary Oresta Gravely, an infant, who sues by Mary Oresta, her next friend, Mae West, and Franklin Oresta, an infant, who sues by Mary Oresta, his next friend, prosecute this writ of error to an order of the Circuit Court of Mercer County, West Virginia, entered April 7, 1951, which set aside the verdict of the jury in favor of the plaintiffs for $2400.00 against the defendants Romano Brothers, Incorporated, a corporation, and Vernon C. Campbell, Eleanor E. Evans and Melvin L. Workman, partners trading as Cliff Coal Company, in an action of trespass on the case instituted by the plaintiffs on January 25, 1950.

To the declaration, which consisted of a single count, the defendants interposed no demurrer but filed their plea of not guilty; and upon the trial of the issues raised by the declaration and the plea, the jury rendered the verdict which the circuit court set aside on motion of the defendants.

The declaration charges, in effect, that the land of the plaintiffs and the dwelling house located on it were negligently and maliciously damaged by the defendants in causing large quantities of water, earth, rock and other like materials to be cast and deposited, and to accumulate and remain, upon the land of the plaintiffs from and by reason of a large embankment constructed by the defendants in the mining of coal by stripping or removing the earth above the coal on land adjoining and above the land of the plaintiffs, in September, 1949, and during the period of approximately one year preceding the institution of this action; and that, as a result of the negligent and malicious acts of the defendants, the plaintiffs have sustained damages to their land in the amount of $5000.00.

At and prior to the time of the commission by the defendants of the acts of which the plaintiffs complain, the plaintiffs were the owners of four contiguous lots of surface land aggregating about seven acres, in or near Matoaka, Mercer County, West Virginia. A part of this land, containing about one acre and a half fronting on a public highway known as Route 10 for a distance of approximately 450 feet and having a depth of approximately 120 feet, is level and the remaining part of the land is mostly steep hillside which extends up the hill to the land on which, at or near the top of the hill, the strip mining operation conducted by the defendants was located. On the level portion, which is slightly below the elevation of the highway, are a four room one story dwelling, a coal house, and other outhouses. At one time this level section contained a small garden. To one side and in the rear of the dwelling is the mouth of a steep hollow or ravine which extends up the hill beyond the boundary of the land of the plaintiffs and upon the land used by the defendants in connection with their mining operation. A small stream, which is fed by a spring near the upper end of the hollow, runs through the hollow and into ditches on the level land of the plaintiffs which in turn lead to a culvert under the highway in front of the dwelling. In that manner the surface water from the hollow was normally carried or drained from the land of the plaintiffs before it was damaged.

The title to the land of the plaintiffs and the land used by the defendants in their coal mining operation is derived from a common source. The land used by the defendants, including the coal within and underlying the surface owned by the plaintiffs, is owned by Pocahontas Land Corporation, and the defendants mined the coal by their stripping operation pursuant to the rights granted to them by the owner of the coal. The deed of severance, made by the owners of both tracts of land in 1885, which conveyed the surface, reserved all the coal and other minerals and contained this reservation: "With the right and privilege of full and free ingress or egress in, on,

beneath and over said lands for the purpose of mining, excavating, shipping and removing said coal and other minerals with all necessary and proper rights of way, roadways and all, and every privilege necessary to the full and perfect enjoyment of the rights and privileges herein reserved." The plaintiffs own and hold the surface of the seven acres subject to the foregoing mining rights and, subsequent to the deed of severance, the Pocahontas Land Corporation became the owner of the surface of the tract used by the defendants in mining the coal.

Sometime prior to August, 1948, the defendants, Campbell, Evans and Workman, partners trading as Cliff Coal Company, who had acquired the rights of the Pocahontas Land Corporation to mine and remove the coal in the land adjoining and above the land of the plaintiffs, entered into a contract with the defendant, Romano Brothers, a corporation, by which that corporation was employed to mine and remove the coal by the method of strip mining and in which it agreed, in performing that work, "not to cast or dump any material excavated so as to permit the same to roll or fall upon the railroad tracks, roads or buildings located below such excavation." Under the contract the defendant Romano Brothers entered upon the land above the land of the plaintiffs and, by the use of heavy grading machinery and steam shovels, mined and removed approximately ten thousand tons of coal which could have been mined or recovered only by strip mining.

In the process of conducting the mining operation, which ended in September, 1948, or sometime in 1949, the defendant, Romano Brothers, removed the surface above the coal and with it constructed a large embankment, resembling a roadbed and composed of dirt, rock, coal and other like materials, on the steep hillside about seven or eight hundred feet above and distant from the dwelling of the plaintiffs. It also built three wooden barriers or "dams" across the hollow above the land of the plaintiffs at locations approximately one hundred and twenty five feet apart for the purpose of impounding dirt, rock and debris from the embankment and preventing these substances

from encroaching upon the land of the plaintiffs. Each of these dams is about five feet in height and about thirty feet in length. Two of them were still intact at the time of the trial of this case; and each of them was partly filled with dirt, rock and debris which had slipped, rolled, or been washed down the hollow from the embankment. These dams, however, did not prevent some of the dirt and rocks from descending upon the land of the plaintiffs.

While the defendant, Romano Brothers, was engaged in mining and removing the coal, or after it had been mined and removed, and particularly in August, 1949, and at different times after that date, following any ordinarily heavy rainfall, large quantities of dirt, mud, and rock from the embankment passed down the hollow and were cast or washed and deposited on the level part of the land of the plaintiffs near, under, and in front of, their dwelling. These deposits of dirt range in height from fourteen inches to three and one half feet, cover much of the lawn around the dwelling, obstruct the drainage ditches, and cause the water which normally ran through them to be diverted and to stand and accumulate under the dwelling and at other places on the lawn where it becomes stagnant and emits offensive odors.

Upon the trial of this case, the plaintiffs, seeking recovery of permanent rather than temporary damages, introduced testimony to show the difference between the market value of their property immediately before and immediately after it was injured by the defendants. To limit or reduce the amount of the damages the defendants offered evidence to show that the property could be restored to substantially the same condition which existed before it was damaged at a total cost of $400.00.

In support of their contention that the verdict, which was set aside by the trial court, should be reinstated and judgment should be entered upon it by this Court, the plaintiffs insist that the verdict was fully supported by the evidence and that the negligent injury to the property is fully proved by the evidence. On the contrary the de-

fendants contend that the order setting aside the verdict should be affirmed on substantially these grounds: (1) In mining the coal according to approved and recognized method of strip mining, the defendants were not negligent and consequently are not liable for the resulting damage to the property of the plaintiffs; (2) the mining rights granted by the owner of the coal and the surface of the land used by the defendants permitted them, without liability for damages, to subject the land of the plaintiffs to the burden imposed by the presence upon it of the dirt, rock, debris and other like materials from their strip mining operation; and (3) the verdict is excessive because it awards damages to which the plaintiffs are not entitled by reason of their failure to exercise reasonable care to mitigate the damages and their refusal to permit the defendants to restore the property of the plaintiffs to its former condition.

Contrary to the contention of the defendants that negligence on their part which resulted in injury to the land of the plaintiffs is not established, the evidence clearly shows that the defendants were guilty of negligence which was the proximate cause of the injuries, and on that ground the verdict should not have been disturbed. The negligence of the defendants did not arise from the manner in which the defendant Romano Brothers actually removed the coal and its overburden, but in the way in which it placed or dumped the dirt, the rock and the other debris taken from above the coal. It was the duty of the defendants securely to confine and restrain those materials to the land used by them in connection with their strip mining operation and to place them, or cause them to be placed, at such point and in such position that it could not reasonably be expected that they, or some of them, would escape from the land used by the defendants and roll, or slide, or be washed down the steep slope of the hillside, upon the land of the plaintiffs at and near the bottom of the slope. This duty the defendants did not observe or discharge.

In *Weaver Mercantile Company* v. *Thurmond,* 68 W. Va.

530, 70 S. E. 126, 33 L. R. A., N. S., 1061, a case in which a water tank located on land of the defendant burst and the water from it flowed into the store of the plaintiff and damaged his property, this Court held in Point 1 of the syllabus: "A man is bound to use his premises so as not to injure his neighbor's property." The opinion in that case also contains this language: "Liability, in cases like the present, rests upon the principle that a man who erects a structure upon his premises which, because of neglect to take care of it, becomes a nuisance, either to the public or to the property of an adjoining owner, is liable. He is bound, at his peril, to prevent it from injuring the property of his neighbor." See also *Rinehart* v. *Stanley Coal Company*, 112 W. Va. 82, 163 S. E. 766.

Several witnesses, including an officer of the defendant Romano Brothers, testified that by reason of the manner and the position in which the embankment was placed, it was likely that some of the materials of which the embankment was constructed would descend upon the land of the plaintiffs, as large quantities of them actually did, not only once, but on several recurring occasions. To minimize or to prevent the descent to and upon the land of the plaintiffs of dirt, rock, and debris from the embankment was the unaccomplished purpose for which the three dams were built in and across the hollow by the defendant, Romano Brothers. That which, in the circumstances, could reasonably be foreseen or anticipated by an ordinarily prudent person actually occurred. The negligence of the defendants in placing and maintaining the embankment on the steep slope of the hillside, and by so doing creating a private nuisance, and in failing to prevent the encroachment upon the land of the plaintiffs of dirt, rock and debris from the embankment was the proximate cause of the injuries to their land.

In *State ex rel. Davis Trust Company* v. *Sims*, 130 W. Va. 623, 46 S. E. 2d 90, this Court, quoting from two of its earlier decisions and citing a decision of the Supreme Court of Appeals of Virginia, with reference to liability for the natural and probable consequences of negligent

acts and omissions, said: " 'If an injury is the natural and probable consequence of an act done under such circumstances and with such knowledge, as ought to have disclosed the danger to an ordinarily prudent person exercising reasonable foresight, the actor is guilty of negligence in the premises and legally liable in damages for the injury.' *Fields* v. *Director General of Railroads*, 86 W. Va. 707, 104 S. E. 767. 'Party committing breach of duty is liable for its natural and proximate effects, which may be immediate or through subsequent media of natural forces or other innocent causes.' *Mills* v. *Indemnity Ins. Co. of North America*, 114 W. Va. 263, 171 S. E. 532. A person is liable for damages occasioned by his negligence where they could reasonably have been anticipated by an ordinarily prudent person. *Colonna* v. *Rosedale Dairy Co.*, 166 Va. 314, 186 S. E. 94." See also *Rinehart* v. *Stanley Coal Company*, 112 W. Va. 82, 163 S. E. 766.

With respect to the contention of the defendants that they were not guilty of negligence because in mining and removing the coal they conformed to approved and recognized method of strip mining, it should be said that compliance with such mining method does not excuse, or constitute a valid defense against, the consequences of their negligence in locating, constructing, and maintaining the embankment on the steep slope of the hill above the land of the plaintiffs.

As already indicated, the defendants contend that, by virtue of the reservation by the owners of the coal in the deed of severance of the coal from the surface of the two tracts of land here involved, dated February 24, 1885, of the mining rights set forth in the reservation, they are permitted, without liability for damages, in the conduct of their strip mining operation, to cast or deposit, or to cause or permit to be cast or deposited dirt, rock and other debris from such operation upon the land of the plaintiffs. It is evident from the language of the reservation of the mining rights, that, at the date of the deed of severance of the coal on February 24, 1885, the parties to the deed intended that the coal should be mined and removed by

the usual method then known and accepted as common practice in Mercer County, where the lands in question are located, and that such method, as it then existed, did not include the practice of mining and removing coal by strip mining.

This Court reached a similar conclusion in the recent case of *West Virginia-Pittsburgh Coal Company* v. *Strong,* 129 W. Va. 832, 42 S. E. 2d 46, in which the scope of certain mining rights in a deed of severance of the coal in Brooke County, dated May 31, 1904, was considered and determined. To the extent here pertinent, the mining rights in that deed were expressed in these terms: "Together with the right to enter upon and under said land with employees, animals and machinery at convenient point and points, and to mine, dig, excavate and remove all said coal, and to remove and convey from, upon, under and through, said land all said coal and the coal from other land and lands and to make and maintain on said land all necessary and convenient structures, roads, ways, and tramways, railroads, switches, excavations, air-shafts, drains and openings, for such mining, removal and conveying of all coal aforesaid, with the exclusive use of all such rights of way and privileges aforesaid, including right to deposit mine refuse on said land and waiving all claims for injury or damage done by such mining and removal of coal aforesaid and use of such privileges." It was the contention of the corporate plaintiff in that case, who was the owner of the coal, that by virtue of the foregoing mining rights it was entitled to mine the coal by removing the surface overlying it by the use of the strip mining method. This Court rejected that contention and in Point 1 of the syllabus said: "In order for a usage or custom to affect the meaning of a contract in writing because within the contemplation of the parties thereto, it must be shown that the usage or custom was one generally followed at the time and place of the contract's execution." In the opinion this Court also used this language: "We are of the opinion, arrived at by reading the instrument as a whole, that it was the manifest inten-

tion of the parties to preserve intact the surface of the entire tract, subject to the use of the owner of the coal 'at convenient point or points' in order 'to mine, dig, excavate and remove all of said coal' by the usual method at that time known and accepted as common practice in Brooke County. We do not believe that this included the practice known as strip mining." The statement just quoted is directly applicable to the mining rights set forth in the reservation in the deed of February 24, 1885, under which the defendants claim as the grantee of Pocahontas Land Corporation, the owner of the coal, and, as applied to those rights, limits their exercise to the usual method in use in Mercer County at the date of the deed.

In *Rock House Fork Land Company* v. *Raleigh Brick and Tile Company*, 83 W. Va. 20, 97 S. E. 684, 17 A. L. R. 144, the question of the scope of the mining rights involved, and whether they extended to and included, among the minerals conveyed, by a certain deed containing specific mining rights, a particular seam of clay, was considered. The plaintiff in that case contended that the grant to it of the coal and other minerals, except oil and gas, passed title to the seam of clay. In rejecting this contention, this Court said: "In this case we have no evidence as to the situation of the parties at the time of the grant, or their conduct under it, which would aid us in the interpretation of it. We have, however, language used in the deed conveying certain mining rights. The grant of these rights is to mine, excavate and remove all the coal; make and maintain all necessary railroads, excavations, ways, shafts, drains, drainways and openings necessary and convenient for the mining and removal of said coal and other minerals. Substantial aid is afforded by this language in determining what the parties meant by the term, other minerals, in the grant. The rights granted for the removal of these minerals are such rights as are incident to the production of minerals by means of mines, that is by shafting or tunnelling. It would seem quite clear that it was within the contemplation of the parties that the minerals granted were such as it was necessary

to mine for, that is, either to tunnel for or produce by sinking shafts and tunnels therefrom. These rights granted would not be incident to their production in other ways, and * * * we think *. * * that the meaning of the words used in the grant, when construed in the light of this language used in granting the mining rights, are limited to such minerals as are secured by the ordinary processes of mining."

As a general rule, words in a contract will be given their usual and primary meaning at the time of the execution of the contract. 12 Am. Jur., Contracts, Section 236. The foregoing rule applies to technical words in a contract and the meaning of such words must be construed as of the date of the execution of the contract; *Tide Water Oil Sales Corporation* v. *Harper,* 113 W. Va. 643, 169 S. E. 454; and a deed will be interpreted and construed as of the date of its execution. *West Virginia-Pittsburgh Coal Company* v. *Strong,* 129 W. Va. 832, 42 S. E. 2d 46; *Mc-Conaughey* v. *Holt,* 102 W. Va. 290, 135 S. E. 282; *Yonker* v. *Grimm,* 101 W. Va. 711, 133 S. E. 695; *State* v. *Herold,* 76 W. Va. 537, 85 S. E. 733.

In view of the holding of this Court in the *West Virginia-Pittsburgh Coal Company* and *Rock House Fork Land Company* cases, cited above, it is clear that the words "mine, dig, excavate and remove" in the deed involved in the *West Virginia-Pittsburgh Coal Company* case and the words "mine, excavate and remove", in the deed involved in the *Rock House Fork Land Company* case are the substantial equivalents of the words "mining, excavating, shipping and removing" in the reservation of the mining rights here under consideration, and that the mining rights contained in such reservation do not mean or include the right to destroy or remove the surface overlying the coal or to transport and relocate such surface from its original location above the coal, each of which situations necessarily results in substantial measure from the mining of coal by the strip mining method. Though the defendants, having obtained the right to do so from the owner of the coal and the surface of the land used by them in conducting their strip mining operation, could

destroy, remove and relocate the surface of that land overlying the coal, it can not be maintained, with any degree of reason, that the owner of the coal in or underlying the surface of the land of the plaintiffs, under or by virtue of the same mining rights, could destroy, remove or relocate the surface overlying that coal, in mining and removing it.

In support of their contention that the mining rights set forth in the reservation permit the defendants, without liability for damages, to cast or deposit, or to cause or permit to be cast or deposited, dirt, rock and other materials from the embankment on the land used by the defendants, upon the lands of the plaintiffs, the defendants cite and rely upon the cases of *Adkins* v. *United Fuel Gas Company*, 134 W. Va. 719, 61 S. E. 2d 633; *Robinson* v. *South Penn Oil Company*, 112 W. Va. 114, 163 S. E. 857; *Squires* v. *Lafferty*, 95 W. Va. 307, 121 S. E. 90; *Preston County Coke Company* v. *Elkins Coal and Coke Company*, 82 W. Va. 590, 96 S. E. 973; *Simmers* v. *Star Coal and Coke Company*, 113 W. Va. 309, 167 S. E. 737; and *Drummond* v. *White Oak Fuel Company*, 104 W. Va. 368, 140 S. E. 57, 56 A. L. R. 303. None of these decisions, however, applies to the situation which exists in the case at bar, and none of them sustains the above stated contention of the defendants. In none of the six cases just referred to, was the question presented, passed upon or considered, of the right of the owner or the operator of coal to mine and remove it by the method now known as strip mining, under a deed or a contract which conferred upon such owner or operator the right to mine and remove the coal by another and different method which, at the time of the execution of such deed or contract, was recognized as the approved and accepted practice of mining and removing coal in the region in which the coal is located.

With respect to the scope and the effect of mining rights which, without waiver of damages, entitle the owner of coal to mine, excavate and remove it, such as the mining rights here involved, there is a pronounced practical distinction between an injury to, or the imposition of a

necessary or convenient burden upon, the surface of land containing coal in or underneath the surface, each of which may be caused by the mining and the removal of such coal through and by means of excavations, tunnels, and passageways beneath the surface, or through and by means of shafts, borings, slopes, or entries which extend from an opening on the surface in and to the underlying coal and are located throughout their entire course and extent under the surface, and the destruction, the removal, or the relocation in the mining and the removal of coal, of the overlying surface which necessarily results in substantial measure from the use of the presently recognized strip mining method. See discussion of different types of coal mining rights in *Tokas* v. *J. J. Arnold Company*, 122 W. Va. 613, 11 S. E. 2d 759. In the first mentioned situation, the surface, even when broken or caused to subside, is damaged, rather than destroyed; but in the second the surface affected is completely disturbed and is either destroyed or moved to a place other than that of its original location. In view of this real and substantial distinction between an injury to, or a burden upon, the surface, in substantially its original location, and the removal of the surface from that location, it is manifest that mining rights which at the time of their creation are intended to limit, regulate and govern operations and methods which are carried out or engaged in chiefly in the coal and beneath the surface, do not apply to, cover, or permit the removal or the relocation of the overlying surface in the mining and the removal of the coal beneath it. It is also clear that the words "mining, excavating, shipping and removing" of coal, in the reservation in the deed of severance dated February 24, 1885, mean, as the words "mine, excavate and remove" in the deed in the *Rock House Fork Land Company* case were held to mean, that the coal should be removed and produced from mines which contain and make use of shafts or tunnels in their operation; and that the mining rights of the defendants, under the reservation in the deed of severance dated February 24, 1885, do not permit the defendants, without liability for damages, to mine or remove the coal under-

lying the land of the plaintiffs by the strip mining method, and do not permit them, without liability for damages, in mining and removing by that method the coal in the land used by them, to cast or deposit, or cause or permit to be cast or deposited, upon the adjoining land of the plaintiffs, dirt, rock, debris, or other materials from their strip mining operation on the land used by them.

The contention of the defendants that the verdict is excessive because it awards damages to which the plaintiffs are not entitled by reason of their failure to exercise reasonable care to mitigate the injury which resulted from the alleged negligence of the defendants and of their refusal to permit the defendants to restore the property of the plaintiffs to its former condition, is not tenable.

As already indicated, upon the trial of the case the defendants introduced evidence, which was not directly controverted by the plaintiffs, to show that the plaintiffs failed to mitigate or prevent any additional or recurring injury to their property after it was originally damaged in August, 1949, and that the plaintiffs refused to permit the defendants to restore the property to its former condition which could have been done at a cost of $400.00. This evidence, having been permitted by the Court, was undoubtedly considered by the jury in fixing the amount of damages awarded by the verdict. In the trial of the case both the plaintiffs and the defendants entertained the mistaken view that the damages to the property of the plaintiffs were permanent rather than temporary in character.

In the recent case of *Flanagan v. Gregory and Poole, Inc.,* 136 W. Va. 554, 67 S. E. 2d 865, the plaintiffs sought to recover from the defendants damages which resulted to the lands and the buildings of the plaintiffs from the construction and the maintenance by the defendants of an embankment for a roadway over a stream, which embankment contained an inadequate culvert under the roadway and caused the water of the stream to flood and damage the lands and the buildings of the plaintiffs. This

Court held that, though the embankment containing the . inadequate culvert was negligently constructed and maintained, and constituted a private nuisance, the resulting damages were temporary in character.

In that case, discussing the difference between injuries which cause and justify an award of permanent damages and those which cause and justify an award of temporary damages, this Court said: "Whether a given case requires an award of permanent damages or temporary damages depends upon principles heretofore established in this jurisdiction. In the case of *Guinn* v. *Ohio River Railroad Co.*, 46 W. Va. 151, 33 S. E. 87, it is held that if a private nuisance is such that the continuance thereof is necessarily an injury, and it is of a permanent character, 'that will continue without change from any cause without human labor, and dependent for change on no contingency of which the law can take notice, then the damage is original and permanent, * * *.' In such case entire damages past and future may be recovered. It is held to be otherwise 'where the damage is not continuous, but intermittent, occasional, or recurrent from time to time.' "

In pointing out differences in the nature and the degree of injuries to real estate and the damages recoverable in various situations, this Court, in *McHenry* v. *City of Parkersburg*, 66 W. Va. 533, 66 S. E. 750, 29 L. R. A., N. S., 860, used this pertinent language: "Injury to real estate differs in nature and degree. Under some circumstances, recovery may be had from time to time as damages accrue. Under others, but one recovery can be had and that includes all the injury the property has sustained in the past, and will sustain in the future. Damages, recovered in the latter class of cases, are called permanent damages, and damages recovered in the former, temporary damages. Permanent damages are given on the theory that the cause of injury is fixed and indeterminable and the property must always remain subject to it. The injured party is limited to the recovery of temporary damages, when the injury is intermittent and occasional, or the cause thereof remediable, removable or abatable. It assumes

that the plaintiff himself may be able to remedy the cause of injury or relieve his property from its ill effects, or that the defendant will be induced or compelled, by the infliction of repeated judgments for damages, to remove it. *Henry* v. *Railroad Co.,* 40 W. Va. 234; *Godbey* v. *City of Bluefield,* 61 W. Va. 604; Suth. on Dam., sections 114, 115, 116."

In *Hargreaves* v. *Kimberly,* 26 W. Va. 787, this Court, holding that the cause of the injury there under consideration was temporary and removable, and that the damages recoverable were temporary, said in Point 9 of the syllabus: "Where the cause of the injury is in its nature permanent, and a recovery for such injury would confer a license on the defendant to continue the cause, the entire damage may be recovered in a single action; but where the cause of the injury is in the nature of a nuisance and not permanent in its character but of such a character that it may be supposed, that the defendant would remove it rather than suffer at once the entire damage, which it might inflict if permanent, then the entire damage can not be recovered in a single action; but actions may be maintained from time to time, as long as the cause of the injury continues." See *Hurxthal* v. *Boom Company,* 53 W. Va. 87, 44 S. E. 520; *Henry* v. *Ohio River Railroad Company,* 40 W. Va. 234, 21 S. E. 863.

In *McHenry* v. *City of Parkersburg,* 66 W. Va. 533, 66 S. E. 750, 29 L. R. A., N. S., 860, the injury to the real estate of the plaintiff caused by the defendant, a municipal corporation, resulted from the collection and the casting of surface water upon the premises by means of the draining and the sewering of its streets. The draining of the streets and the placing of the sewers subjected the premises of the plaintiff to occasional and intermittent submergence and this Court held that the damages which resulted were temporary, not permanent, in character. In the case at bar, though some of the witnesses testified that the encroachment upon the land of the plaintiffs of dirt and rock from the embankment was continuous, it is clearly established by the facts and the circumstances

that such encroachment generally occurred after a rainfall and that it was occasional, intermittent and recurrent. The difference between the market value of real estate immediately before and immediately after the injury to it, which was shown by the only evidence of damages offered by the plaintiffs, was not the proper measure of damages for the injuries to the land of the plaintiffs and the evidence of that character introduced by the plaintiffs, was inadmissible. In the trial of an action for the recovery of temporary damages to real estate, evidence of the difference between the market value of the property immediately before and immediately after it was injured is inadmissible and, if admitted without objection, a verdict based upon such evidence will, on motion, be set aside. *McHenry* v. *City of Parkersburg,* 66 W. Va. 533, 66 S. E. 750, 29 L. R. A., N. S., 860. The true elements of damages in an action to recover temporary damages for injury to real estate are the cost of repairing the injury to the party, reimbursement for expenses directly occasioned by the injury, and compensation for loss of use or rent of the property. *McHenry* v. *City of Parkersburg,* 66 W. Va. 533, 66 S. E. 750, 29 L. R. A., N. S. 860.

As a general rule a person whose property is endangered or injured must use reasonable care to mitigate the damages; but such person is only required to protect himself from the injurious consequence of the wrongful act by the exercise of ordinary effort and care and moderate expense. The rule just stated has no application when the injury can be prevented only by extraordinary effort or cost, 25 C. J. S., Damages, Section 35; 15 Am. Jur., Damages, Sections 27 and 28; and it has been held to be inapplicable to injuries for which temporary damages only are recoverable. See 5 Michie's Jurisprudence, Damages, Section 17. In *Norfolk and Western Railway Company* v. *Allen and Sons,* 122 Va. 603, 95 S. E. 406, in discussing the subject of mitigation of damages, the Supreme Court of Virginia used this language: "The owner of property is not obliged to so use his own property that another may not injure it. If an injury is merely threaten-

ed, no action lies for the threat, and the property owner is under no obligation to attempt in advance to minimize the results of a wrong which may never be inflicted. If the injury is intermittent and recurrent, entire damages cannot be recovered in a single action, as the injury may never be repeated, and for that reason there is no duty resting upon the party injured to attempt to minimize its consequences. But where the injury is permanent in its character and continuous in its consequences, entire damages may be recovered in a single action, and the duty rests upon the injured party to minimize its consequences if it can be done at a moderate expense and by the exercise of ordinary care."

Though there is authority to the contrary, it is generally held that a person whose property has been injured by the maintenance of a nuisance is not bound to prevent or reduce the damages, especially where the nuisance is in a place over which he has no control. 66 C. J. S., Nuisances, Section 177; 39 Am. Jur., Nuisances, Section 138; 15 Am. Jur., Damages, Section 41. See *Haywood* v. *Massie*, 188 Va. 176, 49 S. E. 2d 281. The negligent construction and maintenance of the embankment by the defendants on the land used by them, constituted, in law, a private nuisance, over which the plaintiffs had no control, and, although the damages to the land of the plaintiffs were negligently inflicted, they resulted from the nuisance and were temporary, rather than permanent, in character. The plaintiffs were under no duty to mitigate or prevent damages to their land which resulted from the nuisance maintained by the defendants; and the evidence introduced by the defendants to show that the plaintiffs failed to take any action to mitigate damages and refused to permit the defendants to enter their land and take such action for them was inadmissible. See *Norfolk and Western Railway Company* v. *Allen and Sons*, 122 Va. 603, 95 S. E. 406.

The defendants offered two instructions, No. 2 and No. 3, which dealt with the subject of mitigation of damages. The court gave instruction No. 2 but refused to give

instruction No. 3. As the plaintiffs were under no obligation to mitigate the damages both instructions should have been refused.

As already pointed out, the only evidence on which the jury could base its verdict of $2400.00 was the evidence, given by several witnesses, of the difference between the market value of the property immediately before and immediately after the injury, which ranged from $2250.00 to $4000.00. All this evidence, was inadmissible and, though introduced without objection, should have been excluded. *McHenry* v. *City of Parkersburg,* 66 W. Va. 533, 66 S. E. 750, 29 L. R. A., N. S., 860. The only other evidence relating to the amount of damages was that introduced by the defendants to the effect that the cost of restoring the property to its condition before the injury was $400.00. A verdict which is clearly in excess of the amount which the evidence shows the plaintiff is justly entitled to recover should be set aside by the trial court. *Drummond* v. *Cook Motor Lines, Inc.,* 136 W. Va. 293, 67 S. E. 2d 337; *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; *Welty* v. *Baer,* 107 W. Va. 226, 148 S. E. 193.

Because of the improper admission of evidence of the difference between the market value of the property immediately before and immediately after the injury and because the verdict was clearly in excess of the amount which, under any competent evidence, the plaintiffs were entitled to recover, the action of the circuit court in setting aside the verdict and awarding the defendants a new trial was correct and proper.

For the reasons stated in the preceding paragraph of this opinion, the order of the circuit court, which set aside the verdict and granted the defendants a new trial, is affirmed.

*Affirmed.*