482 S.E.2d 226

**Bobby Z. JEFFREY, as Personal Representative of the Estate of Karen Jean Jeffrey, Plaintiff Below, Appellant,**

v.

**WEST VIRGINIA DEPARTMENT OF PUBLIC SAFETY, DIVISION OF CORRECTIONS; Donald Ervin, Individually and in his Official Capacity as Director of the Charleston Work Release Center; Debbie Cottrell, Individually and in her Official Capacity as Counselor at the Huttonsville Correctional Facility; Billy Joe Hottle and Craig S. Swick, Defendants Below, Appellees.**

No. 23367.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Dec. 20, 1996.

Rehearing Denied Jan. 17, 1997.

Daniel R. James, F. Cody Pancake, III, Barr & James, Keyser, P. Rodney Jackson, Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for Appellant.

David P. Cleek, Lou Ann S. Cassell, McQueen, Harmon, Potter & Cleek, Charleston, for West Virginia Department of Public Safety, Division of Corrections, Donald Ervin, and Debbie Cottrell.

PER CURIAM:

This is an appeal [1] by Bobby Jeffrey (hereinafter "the Appellant") from a decision of the Circuit Court of Kanawha County dismissing his wrongful death action against the Division of Corrections (hereinafter "the Appellee"). The lower court dismissed the action based upon preclusion by the public duty doctrine, and the Appellant contends that the action is not barred. We affirm in part, reverse in part, and remand for consideration of applicable insurance coverage.

## I.

In 1993, while incarcerated in Huttonsville, West Virginia, and working with the Huttonsville Correctional Center Work Detail in Cass, West Virginia,[2] Billy Joe Hottle formulated a document enumerating a detailed plan of destruction and murder of several prominent persons in the vicinity of Petersburg, West Virginia.[3] Although Mr. Hottle had discussed some of these plans with his prison counselor, Ms. Debbie Cottrell, she was apparently ordered to shred the information,[4] and no specific efforts were made to

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

2. This work detail is located in Cass, West Virginia, and the inmates maintain the Cass Scenic Railroad park.

3. Mr. Hottle and his first cousin, Craig Swick, had stolen two vehicles in Richmond, Virginia, in 1991 or 1992, had entered pleas, and had been adjudicated guilty of grand larceny. Although they were housed in separate facilities, they could communicate by letter or telephone.

4. Ms. Cottrell, in March 1993, apparently destroyed over 500 handwritten pages and over 1000 newspaper clippings which had been collected by Mr. Hottle and allegedly evidenced Mr. Hottle's criminal intentions. Mr. Hottle allegedly requested that Ms. Cottrell destroy some of the documents. She was apparently uncomfortable about such destruction, and asked the advice of

assure that Mr. Hottle would be powerless to accomplish his goals. On July 15, 1993, while on work detail at Cass, Mr. Hottle was reprimanded for cussing officers and violating work duty regulations. He was therefore sent back to the prison. Later that day, however, Mr. Hottle was permitted to return to work detail. On July 28, 1993, Mr. Hottle again violated work detail regulations by swimming in the river with local residents. Yet he was still permitted to participate in the work detail. On August 5, 1993, Mr. Hottle escaped.

Craig Swick, Mr. Hottle's first cousin, was incarcerated at the Charleston Work Release Center at the time of Mr. Hottle's escape. Despite concerns by corrections officials that Mr. Hottle would attempt to contact his cousin,[5] Mr. Swick was given a two-hour pass for furlough from the center on August 15, 1993, and Mr. Swick failed to return to the center. Mr. Hottle and Mr. Swick engaged in a crime spree [6] which culminated in the murders of three people, including the Appellant's wife, Karen Jeffrey. On August 23, 1993, Mr. Hottle and Mr. Swick murdered Mrs. Jeffrey while she was working in a Seven–Eleven store in Keyser, West Virginia, a crime for which both men were subsequently convicted of first degree murder.[7] Mr. Hottle and Mr. Swick abducted and forced a minister, his

wife, and their granddaughter to drive them from Fayette County to Grant County on August 26, 1993, and they were finally apprehended on August 27, 1993, as they attempted to steal vehicle keys from employees at a Petersburg automobile dealership.

As investigation into the escapes ensued, Correctional Officer Robin Hammer of Huttonsville faxed a letter to the Warden's Office alleging that negligence on the part of Huttonsville Correctional Center administrators resulted in the escape of Mr. Hottle. On August 22, 1995, the Appellant instituted a wrongful death action against the Appellee, and the Appellee filed a motion to dismiss on September 25, 1995, alleging that it owed no special duty to Karen Jeffrey to exercise reasonable care in controlling Mr. Hottle and Mr. Swick, and that pursuant to the public duty doctrine, it could not be held liable in the wrongful death action. The lower court, after submission of briefs and arguments of counsel, agreed and dismissed the Appellant's action by order dated January 19, 1996. Specifically, the lower court held that the Appellant had failed to meet the standards enunciated in *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307 (1989), and *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 412 S.E.2d 737 (1991),

---

her supervisor, Joe Sylvester, who instructed her to shred the documents.

5. For approximately one year prior to their escapes, the cousins had corresponded with one another, plotting certain criminal actions designed to seek revenge for perceived injustices against them by people within their home communities of Petersburg and the Grant County area. The plan, documented by Mr. Hottle in a manual entitled "Global Federation Operations Manual for the Operation Strike," involved stealing vehicles, killing or injuring certain people, robbing a bank, destroying property, and other illegal actions. The Appellant alleges that Corrections officials had actual knowledge of this manual and its contents through conversations between Mr. Hottle and his counselor, Ms. Cottrell, as well as Ms. Cottrell's possession and subsequent shredding of some of this documentation.

6. The illegal activities were initiated by Mr. Hottle and Mr. Swick on August 18, 1993, when they entered Petersburg and stole a vehicle from the parking lot of a local 7–11 store. On August 21, 1993, they stole another vehicle and found, inside the vehicle, a .22 caliber Ruger semi-auto-

matic pistol with ammunition. When the vehicle became low on oil, they abandoned it and walked to the residence of Leon Miller and Donna Ours sometime after 10:15 p.m. on August 22, 1993. The bodies of Mr. Miller and Ms. Ours, both having been shot in the head several times, were found at their residence on August 23, 1993. Mr. Swick and Mr. Hottle stole a yellow Geo Storm owned by Ms. Ours, and that same vehicle was seen outside the 7–11 store in Keyser, West Virginia, where the Appellant's wife worked.

7. Mr. Hottle's murder conviction was recently affirmed by this Court in *State v. Hottle*, 197 W.Va. 529, 476 S.E.2d 200 (1996). Mr. Hottle received the following sentences: three life terms for two felony murder and one kidnaping convictions, two terms of not less than one nor more than five years for the two attempted murder convictions, a ten-year minimum term for attempted aggravated robbery and three terms of not less than one nor more than ten years for three grand larceny convictions. These sentences were to run consecutively with any other sentences with no recommendation of mercy.

to overcome the obstacle created by the public duty doctrine.

## II.

■ The Appellant contends that the lower court erred in failing to follow the principles enunciated in *State ex rel. Davis Trust Company v. Sims*, 130 W.Va. 623, 46 S.E.2d 90 (1947). In *Sims*, the deceased had been raped and murdered by an inmate at Huttonsville after the inmate had been permitted to leave the prison unaccompanied. The Davis Trust Company, as Administrator of the personal estate of the deceased, sought a peremptory writ of mandamus to compel the state auditor to order payment for damages resulting from the death of the intestate elderly woman. 130 W.Va. at 624, 46 S.E.2d at 91. In holding that the officers in control of the inmate were negligent in their duty to supervise the inmate, we discussed the obligation to "exercise due care to keep the convict ... in continuous and secure confinement and to prevent his escape...." *Id.* at 630, 46 S.E.2d at 94. We concluded in syllabus point one of *Sims:*

> A moral obligation of the State exists in favor of the personal representative of a deceased person, and may be so declared and a valid appropriation of public funds for its payment made by the Legislature, when it appears that officers or agents of

the State have negligently failed to perform an official duty imposed upon them and, as the natural and probable consequence of their negligence, death results to an innocent person from a murderous attack made by a convict committed, by sentence of life imprisonment for murder, to a state prison under their control, and, with knowledge of his vicious disposition and propensity to commit murder, they enable him, while unobserved and armed with a knife, to leave the prison and utilize the opportunity so presented for him to kill such person.

130 W.Va. at 623, 46 S.E.2d at 91.

The lower court examined the *Sims* precedent and concluded that only a moral obligation applicable to the particular circumstance in the Court of Claims had been established. As the lower court noted, the *Sims* Court was not presented with an issue of immunity. Rather, the Legislature had authorized and directed the state auditor to command payment, "from the state general revenue fund, in favor of the petitioner as administrator of the estate of the decedent for $5,000, as compensation to her heirs for her wrongful death, and declared the appropriation of that amount necessary to discharge a moral obligation of the State." *Id.* at 624, 46 S.E.2d at 91.[8] Thus, *Sims* established

---

**8.** The function and purpose of the Court of Claims was explained in *Pittsburgh Elevator Co. v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675, (1983), as follows:

> The Legislature has also sought to ameliorate the harshness of the constitutional bar to suits against the State by creation of the Court of Claims, which is authorized to consider and approve claims against the State not otherwise cognizable in the regular courts of the State, and to recommend an award to the Legislature. *See* W.Va.Code §§ 14–2–1 *et seq.* (1979 Replacement Vol.). However, the recommendation of the Court of Claims is not binding on the Legislature, which may accept or reject the court's findings and approve or disapprove its recommendations. *See, e.g., State ex rel. Stollings v. Gainer*, 153 W.Va. 484, 170 S.E.2d 817 (1969).

172 W.Va. at 754, n.7, 310 S.E.2d at 686, n. 7.

In *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 359 S.E.2d 124 (1987), we discussed the remedy available to contractors, which were seasoned and sophisticated business entities, on their claims against the state Board of Regents. We concluded that their sole and exclusive remedy was adjudication of claims before Court of Claims based upon the immunity of the Board of Regents. Such immunity could not be overcome in an attempt to recover damages against state by means of civil action, extraordinary writ, or any other legal or equitable remedy. 178 W.Va. at 297, 359 S.E.2d at 130.

We also discussed the role of the Court of Claims in *State ex rel. C & D Equipment Co. v. Gainer* 154 W.Va. 83, 174 S.E.2d 729 (1970), and concluded in syllabus point three that "[o]nly the legislature can authorize such payments if and when they are found and declared by it to be moral obligations of the State, and specific appropriations made for payment thereof." In syllabus point four, we continued: "The jurisdiction of the State Court of Claims extends to claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the State or any of its agencies, which the State should in equity and good conscience discharge and pay." 154 W.Va. at 84, 174 S.E.2d at 730. "Any monetary claims against an agency of the state which is

only the moral obligation of the State to pay the decedent's administrator an appropriation based upon the State's negligence in allowing the inmate's escape. As the lower court correctly concluded, *Sims* does not answer the question presently before this Court and does not impact upon the immunity defenses potentially available to the State.

### III. Public Duty Doctrine

In our recent decision in *Parkulo v. West Virginia Board of Probation and Parole and The West Virginia Division of Corrections,* 199 W. Va. 161, 483 S.E.2d 507 (1996), the plaintiff instituted a civil action against Probation and Corrections after she was raped by a convicted criminal who had been released from prison. The Circuit Court of Cabell County granted summary judgment to both Corrections and Probation, based upon the contention that the suit was barred by the public duty doctrine. We concluded in *Parkulo* that both entities were immune from suit, Probation's immunity based upon a quasi-judicial immunity principle and Corrections' immunity based upon the public duty doctrine. However, based upon the State's insurance coverage, we remanded to determine whether the acquisition of the insurance waived either or both of the immunity defenses. For purposes of remand, we explained that if the State's insurance contract provides coverage, then the entities may be liable up to the limits of coverage, depending in part on what defenses, if any, are waived by the insurance coverage. 199 W. Va. at 180, 483 S.E.2d at 526.

■ The present case may be resolved on the same basis. "The public duty doctrine, simply stated, is that a governmental entity is not liable because of its failure to enforce regulatory or penal statutes." Syl. Pt. 1, *Benson v. Kutsch,* 181 W.Va. 1, 380 S.E.2d 36 (1989). As we recognized in *Benson,* "[t]he public duty doctrine is a principle independent of the doctrine of governmental immunity, although in practice it achieves much the same result." *Id.* at 2, 380 S.E.2d at 37. The duty imposed upon a governmen-

tal entity is one owed to the general public, and unless the injured party can demonstrate that some special relationship existed between the injured person and the allegedly negligent entity, the claim is barred. As we recognized in *Parkulo,* recovery may result for negligence only if the breached duty was "owed to the particular person seeking recovery." 199 W.Va. at 172, 483 S.E.2d at 518. This special relationship requirement was discussed in *Wolfe* and dictates as follows:

> To establish that a special relationship exists between a local governmental entity and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

Syl. Pt. 2, *Wolfe,* 182 W.Va. at 254, 387 S.E.2d at 308.

■ Thus, in the present case, absent some special relationship between Corrections and Karen Jeffrey, the public duty doctrine precludes the suit. In *Parkulo,* we found that there was "no suggestion that either governmental agency had knowledge that appellant, in particular, would be a likely victim." 199 W.Va. at 180, 483 S.E.2d at 526. Likewise, in the present case, there is no indication that Corrections had any indication that escape of any inmate could result in harm specifically to Karen Jeffrey.

The Appellant has attempted to remove himself from the import of the public duty doctrine by arguing that Section 319 of the Restatement of Torts imposes a duty of control. Indeed, Section 319 does establish that one who takes charge of a third person whom he knows or should know to be likely to

immune from suit is within the jurisdiction of the

Court of Claims." *Id.* at 88, 174 S.E.2d at 734.

cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm. Restatement (Second) of Torts § 319 (1986). Section 319 establishes a *duty*. Assuming breach of that *duty*, there is *negligence*. Having established *negligence*, however, *liability* does not automatically ensue. The public duty doctrine does not state that the entity cannot be deemed *negligent;* it simply states that the entity cannot be held *liable*. Even if Section 319 establishes negligence, the public duty doctrine precludes liability for such negligence; thus, Section 319 is of no assistance to the Appellant in furthering his claim.

IV. The State's Procurement of Insurance

 We recognized in *Parkulo* that the public duty doctrine could be waived or altered by the terms of the State's applicable insurance contract. 1997 WL 426201, — W.Va. at ——, 483 S.E.2d at 524. In syllabus point two of *Pittsburgh Elevator Co. v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), we explained that "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." We therefore remanded the matter in *Parkulo* to determine the precise parameters of the insurance contract, and we further instructed the lower court to permit the action to proceed if applicable insurance policies afforded coverage with respect to the claims asserted. 199 W.Va. at 180, 483 S.E.2d at 526.

Likewise, in the present case, we remand for determination of applicable insurance coverage. While we agree with the rationale utilized by the lower court regarding all substantive issues,[9] dismissal of this action is premature pending determination of applicable insurance coverage. If the State has not procured insurance indicating such coverage,

the public duty doctrine serves as a bar to the Appellant's suit. If the State's insurance does provide coverage, the action may proceed, and liability will be limited only by the limits of insurance coverage.

Affirmed in part; reversed in part; and remanded with directions.

RECHT, Judge, sitting by temporary assignment.

9. The Appellees have asserted error in the lower court's decision that the Appellant's claims were not barred by collateral estoppel. In a suit in Grant County against Corrections by personal representatives of another of Hottle and Swick's victims, the Grant County Circuit Court had held that the public duty doctrine provided that the

entity's breach of duty is not actionable by an individual member of the public. The lower court in the present case did not consider itself collaterally estopped from considering the issues in this matter. We affirm the decision of the lower court in that regard.