503 S.E.2d 502

Robert W. McCORMICK, as Personal Representative of the Estate of Alicia A. McCormick, Plaintiff below, Appellant,

v.

WEST VIRGINIA DEPARTMENT OF PUBLIC SAFETY, Division of Corrections, Joseph Skaff, Individually and in his Official Capacity as Secretary of the Department of Public Safety, Ron Gregory, Individually and in his Official Capacity as Past Commissioner of the West Virginia Division of Corrections, Karen Schumaker, Individually and in her Official Capacity as former Chief of Community Services with the Division of Corrections, Donald Smith and Harold D. Gunnoe, Defendants below, Appellees.

No. 24446.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 1998.

Decided May 8, 1998.

Mike Kelly, Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for Appellant.

John R. Fowler, Mary Sanders, Kathleen H. Jones, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, for Appellee Smith.

David P. Cleek, Marilyn T. McClure, Lou Ann S. Cassell, McQueen, Harmon, Potter & Cleek, L.C., Charleston, for State Appellees.

Marc P. Turgeon, Charleston, for Appellee Gunnoe.

PER CURIAM: [1]

This case arises from the July, 1991 murder of Alicia McCormick, a Charleston, West Virginia social worker. Ms. McCormick was stabbed to death in her apartment by Harold D. Gunnoe ("Gunnoe"), an inmate at the Charleston Work Release Center ("CWRC"), operated by the appellee West Virginia Department of Public Safety, Division of Corrections ("DOC"), a state agency. At the time of Ms. McCormick's murder, she was living in an apartment building owned by the appellee, Donald Smith ("Smith").

On July 16, 1993, the appellant Robert McCormick, as administrator of Alicia McCormick's estate, filed a wrongful death suit in the Circuit Court of Kanawha County against (a) the DOC and several of its officials; (b) Donald Smith; and (c) Harold Gunnoe—claiming that these defendants' wrongful conduct proximately caused or contributed to Ms. McCormick's death.

On August 25, 1994 the circuit court dismissed the DOC officials in their individual capacities and dismissed the appellant's request for punitive damages against the DOC and its officials. On January 3, 1997 the circuit court granted summary judgment against the appellant on his claim against Smith. Finally, on May 8, 1997 the circuit court granted a motion for summary judgment made by the DOC and its officials in their official capacities. The appellant appeals all of these rulings, which dismiss all of the appellant's claims against the DOC, its officials, and Smith.[2]

We reverse the May 8, 1997 grant of summary judgment for the DOC and its officials

in their official capacities, but we affirm the circuit court's other rulings.

I.

*Facts and Background*

In 1991, Gunnoe was serving a five-to-18 year imprisonment sentence for second-degree murder. Gunnoe had stabbed to death Veronica Blanton, a counselor whom Gunnoe met in a substance abuse program. Gunnoe pled guilty to second-degree murder after his first-degree murder conviction for Ms. Blanton's death was overturned on the grounds that an illegally obtained confession was used as evidence at his trial. *See State v. Gunnoe,* 179 W.Va. 808, 374 S.E.2d 716 (1988).

In addition to the murder of Ms. Blanton, Gunnoe had a substantial record of involvement with the criminal justice system. In over 15-plus years, in addition to the Blanton murder, Gunnoe had been arrested and charged with forgery, worthless checks, uttering, burglary, breaking and entering, assault with a deadly weapon, grand larceny, resisting arrest, escape and parole violation. In a number of instances, however, no convictions followed the arrests or charges.

On March 28, 1990, after serving about three and one-half years in prison for Ms. Blanton's murder, Gunnoe was transferred by the DOC from the medium security prison at Huttonsville, West Virginia, to the unsecured Charleston Work Release Center.

Gunnoe's conduct at the CWRC was poor. He was removed from his first "inside" job at the CWRC, a maintenance position, for inadequate work. He quit or was fired from his first "outside" job. He broke CWRC rules by cashing his first paycheck instead of turning it in. He was fired from a second outside job.

In September, 1990 Gunnoe pled guilty to 16 CWRC disciplinary charges of fraudulent

---

**1.** We point out that a *per curiam* opinion is not legal precedent. *See Lieving v. Hadley,* 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

**2.** The circuit court also granted partial summary judgment for the appellant as to liability against Gunnoe; the issue of for what damages Gunnoe is liable is still before the circuit court. Howev-

er, because the circuit court's rulings regarding Smith and the DOC and its officials dispose of their interest in the case, all of the parties agree—as do we—that this appeal of those rulings is properly before this Court. *See* Syllabus Point 2, *Durm v. Heck's, Inc.,* 184 W.Va. 562, 401 S.E.2d 908 (1991).

misrepresentation and failure to proceed or return, before a DOC magistrate. Gunnoe was sentenced to return to Huttonsville, but the sentence was suspended and Gunnoe was given a punishment of "lost privileges" for 30 days.

Gunnoe continued to perform poorly. He failed to attend counseling, failed to turn in his paycheck, and he unlawfully operated a motor vehicle without insurance. He was fired from a third outside job, and lied about another job. In May, 1991 he was fired from a fourth outside job—for poor work habits, bad attitude, and refusal to work.

In June 1991, Gunnoe was discharged from a fifth outside job, because he "constantly mouthed off, refused work details, refused to work, made inappropriate comments to females, and had a bad attitude with the supervisor." On June 5, 1991, DOC staff summarized Gunnoe's history at the CWRC in a memo urging his return to Huttonsville, as a "program failure."

Meanwhile, in March of 1991, Gunnoe and his then-wife had moved into an apartment in Charleston, next door to an apartment building owned by the appellee Smith. (Apparently the CWRC allowed some inmates who were assigned to the CWRC to reside away from the CWRC, on "furlough" status.) Smith and Gunnoe spoke, and this conversation led to Gunnoe beginning to perform part-time maintenance work for Smith on several rental properties owned by Smith.

Gunnoe and his wife thereafter moved into one of Smith's apartment buildings, agreeing that any work they performed for Smith would go toward their rent. Gunnoe's wife cleaned some of Smith's vacant apartments, and Gunnoe and his father constructed a retaining wall for Smith.

At some point after Smith met and employed Gunnoe, Smith learned that Gunnoe was an inmate at the CWRC, that Gunnoe had been in prison, and that Gunnoe had been convicted of murder.[3] According to Smith, Gunnoe told Smith that Gunnoe had killed a man who raped Gunnoe's sister.[4]

Alicia McCormick was employed as a domestic violence counselor and program director for the YWCA in Charleston. She ran an anger control group that was frequented by work release inmates. On about June 7, 1991, Ms. McCormick moved into an apartment at Smith's Green Meadow apartments. (Green Meadow was not the building where Gunnoe lived.)

In the latter part of June, 1991, Gunnoe informed DOC employee Becky Jordan at the CWRC that Gunnoe had met Ms. McCormick "by doing work at her apartment." In Ms. Jordan's presence, Gunnoe referred to Ms. McCormick as a "looker."

On about July 2, 1991, Ms. McCormick came to the CWRC to discuss with inmates the relationship between alcohol and violence. Gunnoe was "hanging out" in the yard, according to Ms. Jordan, and Ms. Jordan and Ms. McCormick stopped to speak with Gunnoe.

According to Ms. Jordan, Ms. McCormick thanked Gunnoe for hanging blinds for Ms. McCormick at her apartment, and asked Gunnoe if he could locate an air conditioner for Ms. McCormick's use. Ms. Jordan described Gunnoe as "flirting" with Ms. McCormick, because he thought "she was good looking." Ms. Jordan believed that Gunnoe was deliberately present at the CWRC on that occasion because he knew that Ms. McCormick would be there.

---

3. There is a factual dispute in the discovery record about the extent of Smith's contact with the CWRC regarding Gunnoe. Two CWRC employees stated in depositions that they had spoken with Smith about Gunnoe and about Gunnoe's employment by Smith. Smith did not admit to having these conversations. Nothing in these reported conversations, however, substantively contradicted Smith's or other evidence about the scope of Gunnoe's employment by Smith.

4. It appears that Gunnoe was a smooth talker and personable. In a letter sent to the West Virginia Parole Board on July 16, 1991, just four days before Gunnoe murdered Ms. McCormick, O.C. Spaulding, who prosecuted Gunnoe for the Blanton murder, said "Mr. Gunnoe is very personable and easy to like ... [however] he coldly and cruelly took a human life. Doug has never shown or experienced any remorse ... I believe Doug would kill again if the circumstances were to his advantage...." (The DOC did not see this letter before Ms. McCormick's death.)

On about July 18, 1991, Gunnoe and Smith were at the apartment building where Ms. McCormick lived, and Gunnoe whistled at Ms. McCormick as she came down the stairs. Smith admonished Gunnoe.

On or about July 20, 1991, Gunnoe murdered Ms. McCormick in her apartment, by stabbing her to death with a knife. Smith had changed the McCormick apartment locks when Ms. McCormick moved in, and she had the only key. The Charleston police concluded that Gunnoe's entry to the McCormick apartment was not forcible.

## II.

### Standard of Review

A circuit court's entry of summary judgment is reviewed *de novo.* Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law. Syllabus Point 3, *Aetna Casualty and Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.

### Discussion

### A.

### Smith's Liability

The circuit court determined that the appellee Donald Smith could not be liable to the

appellant under the appellant's theory of negligent hiring or negligent retention. We agree.

■ There can be no doubt that this court has recognized a cause of action based upon a claim of negligent hiring (or negligent retention)—as we recently stated in *State ex rel. West Virginia State Police v. Taylor,* 201 W.Va. 554, 560 n. 7, 499 S.E.2d 283, 289 n. 7 (1997)[5]

Paraphrasing slightly a portion of our statement in *Taylor,* we will assume for the purposes of the instant case that a fair formulation of the inquiry upon which liability for negligent hiring or retention should be determined is: "when the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?" *Id.*

■ The appellant claims that Smith, when he learned that Gunnoe was a convicted murderer, should have further investigated Gunnoe's background, assessed whether Gunnoe posed a risk to third persons, and taken appropriate steps to eliminate or minimize any risk—presumably by discharging Gunnoe, circumscribing his activities, more closely supervising him, and/or warning Smith's tenants.

---

5. In *Taylor,* we stated:

This Court has recognized a cause of action based upon negligent hiring. *See King v. Lens Creek Ltd. Partnership,* 199 W.Va. 136, 483 S.E.2d 265 (1996); *Thomson v. McGinnis,* 195 W.Va. 465, 465 S.E.2d 922 (1995); *Sisson v. Seneca Mental Health/Mental Retardation Council, Inc.,* 185 W.Va. 33, 404 S.E.2d 425 (1991). A leading negligent hiring case is *DiCosala v. Kay,* 91 N.J. 159, 450 A.2d 508 (1982).

One commentator has described the test applied by courts in negligent hiring cases as:

When the employee was hired, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result

from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring an unfit person?

Shattuck, Cathie A., "The Tort of Negligent Hiring and the Use of Selection Devices: the Employee's Right of Privacy and the Employer's Need to Know," 11 Indus.Rel.L.J. 2–3, and cases collected therein at notes 2–5. (1989).

The obtaining of criminal history record information has been an issue in a number of negligent hiring and retention cases. *See, e.g., Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 501 A.2d 35 (1985); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn. 1983); *Parker v. Fox Vacuum, Inc.,* 732 S.W.2d 722 (Tex.App.—Beaumont 1987); *Williams v. Feather Sound, Inc.,* 386 So.2d 1238 (Fla.App. 1980).

■ Upon a review of the authorities referenced in *Taylor, supra*, it appears that a primary question in determining whether an employer may be held liable, based on a theory of negligent hiring or retention, is the nature of the employee's job assignment, duties and responsibilities—with the employer's duty with respect to hiring or retaining an employee increasing, as the risks to third persons associated with a particular job increase. *See Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 913 (Minn.1983); *see also* note 4, *supra.*

In the instant case, the circuit court, in granting summary judgment for Smith, determined that the undisputed facts showed that: (1) Smith did not give Gunnoe a key or other means of access to McCormick's apartment; (2) Smith did not give Gunnoe duties which involved contact with McCormick; (3) Smith did not give Gunnoe authority or status which would lead Ms. McCormick to believe that he was trustworthy or reliable; and (4) Smith did not condone or permit any conduct by Gunnoe which was inconsistent with his limited, non-tenant-related duties. (It is true that Gunnoe apparently helped Ms. McCormick with window blinds, but there was no evidence showing that Smith knew of this.)

Additionally, there was no evidence that Smith had knowledge of any current propensity for violence by Gunnoe, despite Gunnoe's murder conviction. The fact that Gunnoe was on work release justifiably gave Smith some degree of assurance that Gunnoe was not viewed by the authorities as an actively dangerous person. Work release personnel did not advise Smith of Gunnoe's poor record as an inmate at the CWRC.

Under these circumstances, we agree with the circuit court that Smith could not be held liable under a theory of negligent hiring or retention. Consequently, we affirm the grant of summary judgment for Smith.

---

**6.** In the instant case we apply the same legal principles to the claims against the DOC and its officials in their official capacities, and may refer to them collectively as "the DOC."

## B.

### *The DOC's Liability*

In the instant case, any liability of the DOC[6] is subject to and controlled by the application of the "public duty" doctrine—and the "special duty" or "special relationship" exception to that doctrine. *See Parkulo v. West Virginia Bd. of Probation and Parole,* 199 W.Va. 161, 483 S.E.2d 507 (1996).

■ The public duty doctrine states that a governmental entity's liability for nondiscretionary governmental functions may not be predicated upon the breach of a general duty owed to the public as a whole; instead, only the breach of a duty owed to the particular person injured is actionable. *Wolfe v. City of Wheeling,* 182 W.Va. 253, 256, 387 S.E.2d 307, 310 (1989).

■ The linchpin of the "public duty doctrine" is that some governmental acts create duties owed to the public as a whole and not to the particular private person or private citizen who may be harmed by such acts. *Parkulo v. West Virginia Bd. of Probation and Parole,* 199 W.Va. 161, 172, 483 S.E.2d 507, 518 (1996).

■ The "special relationship" or "special duty" exception to the public duty doctrine states that if a special relationship exists between a governmental entity and an individual which gives rise to a duty to such individual, and the duty is breached causing injuries, then a suit may be maintained against such entity. Syllabus Point 3, *Benson v. Kutsch,* 181 W.Va. 1, 380 S.E.2d 36 (1989).

The public duty doctrine and its 'special relationship' exception apply to W.Va.Code § 29–12–5 actions against the State and its instrumentalities, unless the doctrine is expressly waived or altered by the terms of the applicable insurance contract.

Syllabus Point 10, *Parkulo.*[7]

In cases arising under W.Va.Code § 29–12–5, the question of whether a special

---

**7.** *W.Va.* 29–12–5 [1986 & 1996] applies to actions for which the state has insurance coverage. In the instant case, the appellant also argues that the "wrongful acts" language in the DOC's insurance policy expressly waived or altered the pub-

duty arises to protect an individual from a State governmental entity's negligence is ordinarily a question of fact for the trier of the facts.

Syllabus Point 11, *Parkulo.*

The four requirements for the application of the "special relationship" exception to W.Va.Code § 29–12–5 cases are as follows: (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking.

Syllabus Point 12, *Parkulo.*

This Court has applied the public duty and special relationship doctrines in cases involving persons who claim to have been injured as a result of conduct by state agencies and state officials supervising inmates and prisoners like Gunnoe. *Jeffrey v. W.Va. Dept. of Public Safety,* 198 W.Va. 609, 482 S.E.2d 226 (1996) (*per curiam* ); *Parkulo, supra.*

■ In the instant case, the circuit court determined that there was no evidence from which a fact finder could conclude that there was any special relationship between the DOC and Ms. McCormick that would give rise to a special duty on the part of the DOC to Ms. McCormick—and therefore, that summary judgment for the DOC should be awarded.

We have carefully reviewed the record, and although the evidence of such a special relationship is not overwhelming, upon our *de novo* review, we disagree with the circuit court's conclusion. We conclude that such evidence is present to a sufficient degree to allow the appellant's claims against the DOC and its officials in their official capacities to survive a motion for summary judgment.

Specifically, assuming as true and adopting all permissible inferences from the record before the circuit court in favor of the appellant, a jury could find that the DOC, by its invitation to Ms. McCormick and by utilizing her services as a counselor, assumed an affirmative duty to take reasonable actions to protect Ms. McCormick by giving her cautionary information about Gunnoe, who had taken an inappropriate personal interest in Ms. McCormick, and who the DOC had reason to believe might have contact with her in non-institutional settings.

The DOC argues that the circuit court's granting of summary judgment for the DOC is in accord with this Court's holdings in *Parkulo, supra* and *Jeffrey, supra,* both of which involved persons injured or killed by inmates on parole or some sort of work release. However, in both of those cases, this Court agreed that there were no facts that would permit finding a special relationship between the governmental entity and the persons who were the victims of the inmates' misconduct. That is not the situation in the instant case.

A case which is more analogous to the instant case is *Randall v. Fairmont City Police Department,* 186 W.Va. 336, 412 S.E.2d 737 (1991). In *Randall,* as in the instant case, there was an established interconnectedness among the victim, her assailant and the public safety agency. And in *Randall,* this Court found the connections to be sufficient to raise a factual question to be resolved by a jury as to whether the defendants breached a special duty owed to the decedent—even though there was no allegation that the police had explicitly promised to protect the victim—because the police apparently did nothing to protect the victim, after arguably gaining sufficient knowledge about her and a particular individual so that a jury could find that a reasonable law enforcement agency would have undertaken some action to attempt to protect her.

lic duty doctrine. The circuit court rejected this argument, and ruled that the public duty doctrine applies.

Because we find that there are facts in the instant case which could support a finding of a special relationship exception to the public duty

doctrine, and reverse for trial upon that theory, we do not express any opinion on the merits of the appellant's argument on this issue—and we do not disturb the circuit court's ruling that the public duty doctrine was not expressly waived or altered by the applicable insurance contract.

In the instant case, we follow the approach taken in *Randall*, and we conclude that the circuit court's order granting summary judgment against the DOC (and against the DOC officials in their official capacities only) should be reversed, and the appellant's claims based upon allegations of a special relationship and a special duty should be reinstated.

## C.

### Other Issues

We have reviewed the other assignments of error made by the appellant, including the contention that the circuit court erred in dismissing the DOC officials in their individual capacities and in dismissing the appellant's claims for punitive damages. We do not disturb these rulings by the circuit court.

## IV.

### Conclusion

The May 8, 1997 order of the circuit court granting summary judgment on behalf of the DOC and the DOC officials in their official capacities is reversed; the August 25, 1994 and January 3, 1997 orders of the circuit court are affirmed. This case is remanded for further proceedings in conformance with this opinion.

Affirmed in part; reversed in part; and remanded.

WORKMAN, J., deeming herself disqualified, did not participate in the decision.

STARCHER, Justice, concurring in part and dissenting in part:

I join the majority opinion in all but one respect. I would reverse the circuit court's granting of summary judgment on behalf of the appellee Smith.

The majority refers at note 2 to conflicting evidence about the extent of Smith's contact with the CWRC. I am convinced from a review of the record that this evidentiary conflict creates material issues of fact, and these issues of material fact in turn preclude summary judgment.

The pertinent facts about the evidentiary conflict are as follows:

CWRC records reflect that in April, 1991 Gunnoe requested a $100 check to be made out to Smith for rent. Smith testified that prior to receiving this $100 check from the CWRC, Smith had no knowledge that Gunnoe was an inmate at the CWRC. After receiving the check, Smith testified that he confronted Gunnoe, who claimed to have previously told Smith of Gunnoe's work release status and a story about killing a man who had raped Gunnoe's sister. Smith testified that he knew that Gunnoe was lying when he claimed to have told Smith this story before, but Smith took no action to verify the truth of the story.

Notably, according to Smith's testimony, the receipt of the $100 CWRC check was the only contact that Smith would admit that he had with the CWRC. Smith said he had no recollection of ever meeting or speaking with any DOC employees, or ever going to the CWRC—and he said that if he had done so, he would have remembered it.

Contrary to Smith's testimony, DOC employee Donald Ervin specifically recalled meeting with Smith at the CWRC, and substantially discussing Gunnoe's "work for rent arrangement" with Smith.

According to Ervin, the work to be performed by Gunnoe consisted of "doing building maintenance·on some apartments that he [defendant Smith] owned." Ervin explained that the meeting with Smith occurred some time after the $100 check was requested and approved.

Also contrary to Smith's testimony, DOC employee Karen Spoor specifically recalled having a telephone conversation with Smith about Gunnoe. Spoor also believed that Donald Ervin had spoken to Smith. Spoor stated that Smith indicated that Gunnoe was doing maintenance at Smith's apartments.

The foregoing conflict in the evidence is plain: two DOC employees have specific and consistent recollections of substantial discussions about Gunnoe with Smith, and Smith refuses to admit that these conversations occurred.

If a jury believed the DOC employees (of course, a jury would not have to do so), the

jury could make at least two possible inferences from Smith's contrary testimony.

One permissible inference is that Smith was innocently misremembering the facts.

However, an alternative permissible inference is that Smith was deliberately trying to conceal and minimize the truth about (1) the extent of Smith's appreciation that he was employing a man serving a prison sentence for a brutal murder—and (2) about Smith's ability and opportunity to ascertain important information about that employee, once Smith learned about Gunnoe's criminal background.

A jury could further permissibly infer that if Smith is willing to deliberately misstate the truth to conceal important information showing Smith's involvement with the CWRC, Smith is also willing to be less than candid about other matters—including the scope of Gunnoe's job.

What if such an inference is put together with the fact that Gunnoe installed window blinds for Ms. McCormick in her apartment—and with the indisputably vague record about the exact scope and nature of Gunnoe's work in "building maintenance" for Smith?

From such a combination of facts and permissible inferences, a jury could conclude that the scope of Gunnoe's employment was broader than Smith was willing to acknowledge—and that Smith knew that Gunnoe's work in fact included some degree of access to tenant areas, tenant contact, and/or even a grant of actual or apparent authority to perform repairs in tenants' apartments.

This Court recently stated in *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995):

> The circuit court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986). Consequently, we must draw any permissible inference from the underlying facts in the most favorable light to the party opposing the motion. *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986); *Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433 (1980); *Andrick v. Town of Buckhannon*, 187 W.Va. [706] at 708, 421 S.E.2d [247] at 249. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216. Summary judgment should be denied "even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951). *Similarly, when a party can show that demeanor evidence legally could affect the result, summary judgment should be denied.*

(Emphasis added.)

Certainly, Smith's demeanor as a witness, as he contradicted the direct recollections of the DOC employees, could affect Smith's overall credibility—and thus could affect the result of the appellant's claim against Smith.

Moreover, under the reasoning enunciated in the principal case cited by the majority, *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907 (Minn.1983), it is clear that in a negligent hiring or retention case, if there is substantial factual dispute about the scope of employment or about the care that an employer needs to take, a jury question is ordinarily presented. Such is the teaching of all of the negligent hiring and retention cases that the majority refers to in the instant case and that this Court cited in *State ex rel. West Virginia Police v. Taylor*, 201 W.Va. 554, 560 n. 7, 499 S.E.2d 283, 289 n. 7 (1997).

On the record before us, a jury should make the determination as to the degree of risk associated with Gunnoe's job, the correlative degree and nature of Smith's duty with respect to hiring and retaining Gunnoe, whether that duty was breached, and wheth-

er such a breach proximately caused or contributed to Ms. McCormick's death.

As with the DOC, a finding of liability by Smith in this case would hardly be a certainty. Nevertheless, giving all permissible inferences to the appellant, a jury could find by a preponderance of the evidence that Smith employed Gunnoe to do building maintenance that included access to tenant areas and tenant contact; that Smith was negligent, despite ample opportunity, in not investigating to any degree the background and *bona fides* of such an employee—even when Smith learned that the employee was serving a sentence for murder; and that such negligence proximately caused or contributed to Ms. McCormick's death.

Accordingly, I concur in part and dissent in part.

I am authorized to state that Special Justice ALAN MOATS joins in this separate opinion.